No. 54,467

MARY ETTUS, *Appellee/Appellant/Cross-Appellant/Cross-Appellee,* v. ORKIN EXTERMINATING CO., INC., *Appellant/Cross-Appellee,* ALFRED L. HOHNBAUM, ETHEL M. HOHNBAUM, *Appellees/Cross-Appellants,* KEN BUELTEL d/b/a Ken Bueltel and Associates, *Appellee,* DANIEL MITCHELL, Special Administrator for the Estate of Wilbur T. Gorrell, Deceased, *Appellee/Cross-Appellant.*

(665 P.2d 730)

Opinion filed June 10, 1983.

*Gary D. McCallister,* of Davis, Unrein, Hummer & McCallister, of Topeka, argued the cause, and *Charles L. Davis, Jr.,* of the same firm, was with him on the brief for appellant/cross-appellee, Orkin Exterminating Co., Inc.

*Thomas W. Regan,* of Topeka, argued the cause and was on the brief for appellees/cross-appellants, Alfred L. and Ethel M. Hohnbaum.

*Alan V. Johnson,* of Sloan, Listrom, Eisenbarth, Sloan and Glassman, of Topeka, argued the cause, and *Myron L. Listrom,* of the same firm, was with him on the brief for appellees/cross-appellants Daniel Mitchell, Special Administra-

tor for the Estate of Wilbur T. Gorrell, and appellee Ken Bueltel, d/b/a Ken Bueltel and Associates.

*George E. Erickson, Jr.,* of Topeka, argued the cause and *Leonard M. Robinson,* of Topeka, was with him on the brief for appellee/appellant/cross-appellant/cross-appellee, Mary Ettus.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal from a jury verdict, and judgments entered thereon, in favor of the plaintiff buyer and the former owners of the real property involved in an action for actual and punitive damages based upon allegations of fraud and negligence in the sale of a termite-ridden house to the plaintiff. In April, 1978, the plaintiff Mary Ettus bought a home in North Topeka from Alfred L. and Ethel M. Hohnbaum (Hohnbaums) through the Ken Bueltel real estate agency (Bueltel) and one of its salesmen, Wilbur T. Gorrell (Gorrell). Prior to trial Mr. Gorrell died and plaintiff secured the appointment of Daniel Mitchell as special administrator of his estate. The house had been inspected and certified termite-free by Orkin Exterminating Co., Inc. (Orkin).

When it was determined by Mrs. Ettus shortly after purchasing the house that it was infested with live termites and damaged beyond repair, she brought suit based upon claims of fraud and negligence against the Hohnbaums, Bueltel, Gorrell and Orkin. The Hohnbaums filed a cross-claim against Orkin for fraud. After a two-week trial the jury found against the plaintiff as to all the defendants on her claim for fraud. However, the jury found in plaintiff's favor on her claim for negligence and awarded actual damages of $33,195.00 and punitive damages of $50,000.00. The comparative fault or negligence of the parties was determined to be five percent (5%) against the Hohnbaums and ninety-five percent (95%) against Orkin. The plaintiff, Bueltel and Gorrell were found to be without negligence. Other parties named for the purpose of comparing negligence, but not formally joined as parties, were also found to be without fault. The jury also found in favor of the Hohnbaums and against Orkin on the Hohnbaums' cross-claim for fraud and awarded them $410.00 actual damages and $20,000.00 punitive damages. All parties appeal from various aspects of the judgments and trial proceedings.

The Hohnbaums owned residential property on Kansas Avenue in North Topeka where they had resided for some thirty years. In April, 1976, Mr. Hohnbaum first became aware of

termites on his property and promptly contacted Orkin. After an inspection of the premises by Orkin, the Hohnbaums entered into a contract for subterranean treatment of termites. The inspection had revealed live termites and damage although the written graph and information furnished by Orkin did not reveal the extensive damage which existed. The Hohnbaums paid Orkin $410.00 for the initial contract and treatment which carried with it a guarantee and a right to subsequent regular inspections and a lifetime retreatment contract. The initial treatment was performed by Orkin in April, 1976. In July of the same year the Hohnbaums, while painting, discovered additional termite infestation. Orkin was called and they again treated the area. On August 26th, an additional treatment was required. Thereafter, the Hohnbaums kept the contract current and in force by payment of an annual fee of $45.00.

In early 1978, the Hohnbaums desired to sell their home and listed it with Bueltel. One of the Bueltel salesmen, Mr. Gorrell, showed the property to Mrs. Ettus and on February 23, 1978, she signed a purchase contract with the Hohnbaums in the amount of $21,000.00. The contract contained the following provision:

"Seller agrees to obtain and pay for a termite inspection of said property by a state licensed pest control company and furnish Purchaser a report from said company showing the property to be free of termite infestation; provided, however, if termite infestation is present, Seller may, at his option, pay for treatment and removal of said infestation and pay for repair or damage caused thereby or elect to cancel this contract and all moneys paid hereunder on the purchase price shall be refunded to Purchaser, and thereupon, all parties shall be released from further liability hereunder."

Thereafter Orkin furnished a "wood infestation report" dated April 6, 1978, which found no visible evidence of active or previous infestation and no visible damage to the property. The report also stated that Orkin had treated the property in April, 1976, and that it remained under a guarantee and contract with Orkin. This report was placed in Gorrell's file and was a part of the papers available at the closing of the sale. Sometime between April 7, 1978, and April 24, 1978, some flying insects were observed in the Hohnbaum house and Orkin was again called. Orkin responded and again treated the premises. Orkin prepared another "wood infestation report" which indicated there was some evidence of previous termite infestation and evidence of some *nonstructural* damage. The testimony is in dispute

whether this report was delivered to the Hohnbaums or Gorrell or whether it was delivered at all. Mrs. Ettus was never made aware of its contents and, in any event, both reports were patently false. On April 28, 1978, the real estate sale was completed and Mrs. Ettus became the proud new owner of a home which soon turned out to be a nightmare.

Mrs. Ettus undertook to do landscaping and interior improvements to her newly acquired property. During the course of remodeling Mrs. Ettus discovered live termites in the house. She contacted Orkin and they offered to again treat the property but the offer was declined. Mrs. Ettus contacted Perma-Blitz Pest Control Co. and representatives of that company made a detailed inspection of the property and furnished a comprehensive report of their findings. They determined extensive structural damage, live termites and totally inadequate prior treatment. Various critical areas had not even been treated, despite the repeated visits by Orkin. During the inspection one of the Perma-Blitz men fell through the ceiling while checking the attic. The ceiling gave way due to extensive termite damage. It was recommended that Mrs. Ettus contact the entomology division of the State Board of Agriculture and she did. The report from the State Board of Agriculture, following their inspection of the premises, stated in part:

"An Orkin termite control contract had been issued to the former owner on April 19, 1976, indicating that the only damage was along the west wall. The contract also states how and where various types of treatment were performed on the property. Our inspection indicated that it is unlikely that some of these treatment procedures were followed. The contract stated that cellulose debris was removed but a large amount of debris was noted under the structure.

"Orkin issued a wood infestation report (clearance letter) on April 4, 1978, that stated that there were no termites, no termite damage and no evidence of a previous infestation.

"Perma-Blitz issued a very extensive report and diagrams of the structure, dated September 30, 1978. After examining these reports we find that we are in almost total agreement with the findings of Perma-Blitz.

"In our opinion termites have been present in this structure for quite a number of years. We do not feel that the treatment performed in 1976 was adequate or as complete as stated in the Orkin contract. The wood infestation report issued in 1978 is totally false and inaccurate. It is also our opinion that the termite damage is so extensive and general throughout the structure that it is not repairable. We feel that the termites have totally destroyed this house."

The report further stated that some critical areas which required treatment to obtain effective control had not been treated at all. It

was conceded at trial that the house was a total loss due to termite damage.

We will first consider the twofold appeal of the Hohnbaums. They first contend that the trial court committed error in failing to sustain their motion for a directed verdict against the plaintiff, asserting there was no evidence of any breach of duty owed by them, as sellers, to plaintiff. The evidence is clear that the Hohnbaums became aware of live termite infestation as early as 1976 and that numerous repairs were made to the property at that time. In addition, Orkin was called three times within a span of less than six months to treat for visible live termites. Just a few days before closing the sale of the property to Mrs. Ettus, the Hohnbaums observed flying insects in their home and, suspecting them to be termites, called Orkin for treatment. The first wood infestation report received from Orkin was patently false. None of the previous termite problems was revealed to Mrs. Ettus. In its instruction No. 7, the court told the jury:

" 'Negligence' is the lack of ordinary care. It is the failure of a person to do something that an ordinary person would do, or the act of a person in doing something that an ordinary person would not do, measured by all of the circumstances then existing.

"A party is at fault when he is negligent and his negligence caused or contributed to the event which brought about the injury or damages for which the claim is made."

In *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 228 Kan. 532, Syl. ¶ 3, 618 P.2d 1195 (1980), we said:

"In ruling on a motion for directed verdict pursuant to K.S.A. 60-250, the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. The same basic rule governs appellate review of a motion for directed verdict. Following *Frevele v. McAloon*, 222 Kan. 295, Syl. ¶ 5, 564 P.2d 508 (1977)."

Plaintiff clearly proved a submissible case against the Hohnbaums and there was no error in the court's ruling.

Next the Hohnbaums appeal the trial court's reduction of the punitive damages awarded against Orkin from $20,000.00 to $10,000.00. The trial court on its own motion reduced the punitive award because the amount in controversy as determined by the pretrial questionnaire and order was only

$10,000.00. The record reflects that at the time of argument on the instructions to be given by the court, Orkin wanted the $10,000.00 figure to be included in the instruction or in the special verdict form to be submitted to the jury. The court refused to indicate any amount as to punitive damages for fear the jury might consider it a direction from the court when the jury might otherwise be inclined to give a lesser amount or none at all. The court handled the $250,000.00 punitive damages sought by the plaintiff in the same manner. It appears clear that all parties knew they were controlled by the limits in the pretrial order. The Hohnbaums made no request to amend or modify the pretrial order and did not object to the court's position when it was considered during argument on the instructions and verdict form. A pretrial order, unless modified by the court to prevent manifest injustice, controls the subsequent course of the lawsuit. *Sieben v. Sieben,* 231 Kan. 372, 646 P.2d 1036 (1982). The judgment entered was consistent with the maximum amount of relief sought by the Hohnbaums and with the pretrial order and they cannot now complain when their recovery was limited to the maximum amount sought. The point is without merit.

We now turn to the numerous allegations of error asserted by Orkin in its appeal from both the plaintiff's judgment and the Hohnbaums' judgment. We will first consider the Orkin claims of error directed at plaintiff's judgment.

Orkin alleges error in the trial court's instructions on actual damages which in essence allowed the jury to consider the value of the destroyed property along with "other and further damages that result naturally and were occasioned by the acts of the defendants." The jury was further instructed that the total actual damages could not exceed $35,395.74, the maximum amount shown by the evidence. Orkin contends that as Mrs. Ettus paid $21,000.00 for the property, her damages should be limited to that amount plus loan costs of $771.00 less the value of the real estate lot and the salvage value of the house. Orkin relies on cases in which the court has stated that the ordinary measure of damages to real or personal property is the difference in value immediately before and after the destruction or damage and in the event of total destruction, the fair market value at the time of destruction. See *Anderson v. Rexroad,* 180 Kan. 505, 306 P.2d 137 (1957); *Foster v. Humburg,* 180 Kan. 64, 299 P.2d 46 (1956);

*Kennedy v. Heat and Power Co.,* 103 Kan. 651, 175 Pac. 977 (1918); and *Insurance Co. v. Payne,* 57 Kan. 291, 46 Pac. 315 (1896). We have no quarrel with the general principles of law as stated in those opinions. However, they do not limit the damages resulting from negligence to just the before and after value of the property when there are other damages. As held in *Foster:*

"One who commits a tortious act is liable for the injury and loss that are the natural and probable result of his wrongful act." Syl. ¶ 5.

In the instant case Mrs. Ettus had expended money, over and above the purchase price of the house, for yard improvement and redecorating; she showed lost wages and personal property along with increased mortgage expense and other items. We have considered each of the items of damage complained of by Orkin and find all of them to be such as were the natural result of the acts of the defendants.

Next Orkin alleges error in certain jury instructions given by the trial court. In its instruction No. 2, the court set forth the claims of plaintiff and her burden of proof as to both the negligence and fraud claims. In the same instruction the court advised of the defenses and counterclaim of the Hohnbaums and the defenses of Orkin and the other named parties, which included affirmative defenses asserting negligence on the part of the Hohnbaums and plaintiff. The court also instructed on Orkin's burden of proof in this regard. While the instruction might have been clearer on the respective burdens of proof of the various parties, when all of the instructions are considered together, as they must be, we find them to be adequate and that the jury could not reasonably have been misled as to the burden of proof required of plaintiff, the Hohnbaums or Orkin. See *Hampton v. State Highway Commission,* 209 Kan. 565, Syl. ¶ 6, 498 P.2d 236 (1972); *Huxol v. Nickell,* 205 Kan. 718, 473 P.2d 90 (1970).

Orkin also contends it was error for the court to refuse to give the following instruction:

"You are instructed that any written statements, contracts and records furnished by the pest control service, as defined by the Kansas Pesticide Law and Regulations, are only required to be presented to the customer who orders the service."

The requested instruction was based upon K.S.A. 2-2455. It is the contention of Orkin that the statute limits its obligation and

that it was only required to furnish reports to the Hohnbaums. While the statute does require that certain information be furnished to the customer, it in no way limits any obligation to furnish such information to third parties. The statute does not contain the word "only" as included in the requested instruction and in the instant case Orkin was fully aware that the "wood infestation reports" were to be furnished to a third party. The reports were patently false and Orkin knew a third party would rely upon them. The point is totally without merit.

We have carefully examined all of the instructions in light of all of the arguments of Orkin and when considered as a whole we find no reversible error in the court's instructions. For an excellent discussion of the general principles to be applied in determining whether or not instructions of the trial court are in error see *Bechard v. Concrete Mix & Construction Inc.*, 218 Kan. 597, 545 P.2d 334 (1976).

Next Orkin complains about the form of the special verdict submitted to the jury. Due to the various claims, cross-claims and number of defendants, the special verdict form contained seven parts on four legal-sized sheets of paper. It is argued that the location of the question of whether the jury found punitive damages, and if so, how much, was erroneous in that it followed the question relating to actual damages for negligence. Orkin asserts that it appears that if the jury is to find damages for negligence then they must automatically allow punitive damages. The court instructed the jury, in instruction No. 6, that:

"In considering an award of punitive damages for other than fraud, you must find that the defendant, in addition to the conduct being considered, was wilful, wanton or malicious in their actions."

The instruction goes on to define wilful, wanton and malicious. When the verdict form is considered in light of the instructions, we do not believe the jury could have been misled.

Next Orkin charges plaintiff's counsel and the trial court with misconduct. In its assertions against counsel, Orkin claims plaintiff's attorney violated Orkin's right to a fair trial when in closing argument he referred to specific dollar figures in his quest for actual and punitive damages. Plaintiff's counsel made reference to a chart which illustrated Orkin's financial condition and suggested specific damage figures. Orkin claims the reference to the chart amounted to a request for specific dollar

amounts in punitive damages and actual damages against Orkin and that as such it was improper under Supreme Court Rule No. 118(b) (230 Kan. lxxix-lxxx). That rule states:

"In any action in which the party seeking relief demands an unliquidated amount of money as all or part of the relief he seeks and which action is to be tried to a jury in the district court, the parties and attorneys may state in voir dire and in arguments their valuation of an item of claimed damage and the total amount of damages claimed to have been suffered. They shall not mention any amount as being the award demanded in the written statement."

The last sentence of that rule, the only limitation on counsel's argument, refers to a written statement of damages which may be requested by an adverse party under subsection (a) of the rule. The provisions of Rule 118(a) and (b) set forth the procedure to be followed in complying with K.S.A. 60-208(*a*) and apply only to the written statement of damages contemplated by Rule 118(a). The rule does not preclude an attorney from utilizing a blackboard or chart in final argument to illustrate amounts requested for actual or punitive damages so long as the figures are based upon evidence adduced at the trial. While not too clear, it appears that Orkin is also contending error because of the use of its financial worth in arguing for punitive damages. If so, the argument lacks merit. *Ayers v. Christiansen,* 222 Kan. 225, Syl. ¶ 4, 564 P.2d 458 (1977).

Orkin next complains of the court's misconduct in unduly reprimanding its counsel in front of the jury and in allegedly falling asleep during trial. The trial of this case took about two weeks and the transcript fills eight volumes with over two thousand pages of testimony and argument. Plaintiff's case took some eight days to present. Orkin's counsel, at a time near the end of trial, requested an early morning recess between witnesses when one witness was examined and finished sooner than expected. The request and response was as follows:

"Mr. Davis:     Your Honor, the cross-examination was much shorter than we anticipated. Would it be possible to take the recess early? We may be able to wind up our testimony.
"The Court:     Mr. Davis, I want to get this case concluded, you know that.
"Mr. Davis:     I do too.
"The Court:     I think I have borne down on counsel about that.
"Mr. Davis:     We will call Mr. Lucas."

Orkin now argues and argued on a motion for mistrial that such

conduct by the court prejudiced Orkin and made it appear that Orkin was responsible for the length of the trial and the discomfort and tedium experienced by the court and jury. The motion for mistrial was denied. The court did explain to the jury that its remarks were directed to all parties and not directed at Orkin alone. There is no merit to this claim of error.

In its other claim of misconduct by the court, Orkin alleges the trial judge fell asleep and thereby lost control of the trial. Orkin argues this is grounds for a new trial. Orkin equates this allegation of sleeping with the case where a trial judge left the courtroom, allowing his clerk to preside over final arguments. *Feichter v. Feichter,* 97 Kan. 166, 155 Pac. 42 (1916). In *Feichter* we said only a slight showing of prejudice would be necessary to authorize a reversal. In the instant case the record made during trial does not support the allegations although an affidavit from one of the jurors indicates she thought the judge appeared, in at least one instance, to be asleep. In ruling on the point in Orkin's motion for new trial, the judge said he did not recall dozing off at anytime during the long trial. The court also pointed out that at no time during the trial did counsel claim the court was inattentive or bring any such claim to its attention. When the court did miss the tenor of an objection, it had the reporter's read-back available to it. Assuming there was a credible showing of misconduct by the court, no prejudice has been shown and the mere possibility of prejudice is not sufficient to overturn a verdict. *White v. New Hampshire Ins. Co.,* 227 Kan. 293, 607 P.2d 43 (1980).

Next Orkin contends the trial court erred in refusing to permit Orkin to introduce evidence of its attempts to compromise and settle plaintiff's claims. Orkin wanted to use the evidence for the sole purpose of its defense against plaintiff's claim for punitive damages and to show mitigating circumstances relating to punitive damages. The issue is one of first impression in this state. The proffer of evidence by Orkin's counsel was:

"I will give you a proffer, Your Honor, and I will make a formal proffer, and I will ask specifically and state once again for the record my purpose for the offer and the limitations I think the Court should place upon it.

"The offer will be, (1) that in March of 1979, in advance of filing this lawsuit, in April of 1979, an attempt was made whereby Mr. Davis contacted Mr. Erickson, made an indication that a package amounting to twenty-five thousand dollars might be able to be put together, and to which there was a response that his client

had already told him that unless he could get fifty thousand dollars, to file suit, at which time Mr. Davis responded.

"The manner in which we would elicit that testimony would be through the plaintiff, which would be through a question, 'Had you been advised, ma'am, in March of 1979, in advance of filing this lawsuit, of the possibility to resolve this dispute for the sum of twenty-five thousand dollars,' to which we would ask for her response.

"As an additional proffer, I would think prior to actual commencement of this litigation as to whether or not a formal offer had been extended for her consideration in the sum of thirty-five thousand dollars prior to the time of trial commencing on October 12th.

"The purpose of my offer is simply for the purpose of mitigation of damages, to which this defendant is exposed both in actual damages of evidence upwards of thirty thousand dollars, and a value of a home of twenty-one thousand dollars, and punitive damage claim of two hundred and fifty thousand dollars. It is not, and I repeat, not being offered for the purpose of liability or fault of any party, and we would suggest to the Court give a very strong limiting instruction as to the purpose of the offer directing it simply to the issue of mitigating circumstances either at the time of entry or at the time when instructing this jury concerning punitive damages."

As indicated in the proffer Orkin sought the admission of the offers of settlement under a strong instruction limiting its purpose to the issue of mitigating circumstances concerning plaintiff's claim for punitive damages. It has been consistently held that offers of settlement and evidence of pretrial settlement negotiations are generally inadmissible. There are two statutes in Kansas which specifically concern the admissibility of evidence concerning settlement negotiations. K.S.A. 60-452 provides:

"Evidence that a person has, in compromise or from humanitarian motives furnished or offered or promised to furnish money, or any other thing, act or service to another who has sustained or claims to have sustained loss or damage, is inadmissible to prove his or her liability for the loss or damage of any part of it. This section shall not affect the admissibility of evidence (a) of partial satisfaction of an asserted claim on demand without questioning its validity, as tending to prove the validity of the claim, or (b) of a debtor's payment or promise to pay all or a part of his or her pre-existing debt as tending to prove the creation of a new duty on his or her part, or a revival of his or her pre-existing duty."

K.S.A. 60-453 states:

"Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act or service in satisfaction of a claim, is inadmissible to prove the invalidity of the claim or any part of it."

Neither statute clearly addresses the question posed in this case. Both of these evidence provisions are silent on the question of

punitive damages. K.S.A. 60-452 is concerned with possible prejudice to the defendant *on the issue of liability*. K.S.A. 60-453 is concerned with protecting the plaintiff's claim. In addition to promoting settlement efforts, the purpose behind the former statute is to protect the defendant from an improper inference of liability while the purpose of the latter statute is to protect the full value of the plaintiff's claim during the negotiating process. As neither of these purposes is involved in the issue in the present case, we must look further to determine whether the court erred in excluding the Orkin offers of settlement for the limited purposes proffered. It is clear that all settlement offers or negotiations are not, per se, inadmissible. We have held that an offer of compromise, which may be inadmissible as a basis for an inference of liability, is admissible if it contains an admission of fact. *Patterson v. Burt,* 213 Kan. 463, 516 P.2d 975 (1973); *Lord v. State Automobile & Casualty Underwriters,* 208 Kan. 227, 491 P.2d 917 (1971); *O'Bryan v. Home-Stake Production Co.,* 195 Kan. 213, 403 P.2d 978 (1965). K.S.A. 60-406 provides:

"When relevant evidence is admissible as to one party or for one purpose and is inadmissible as to other parties or for another purpose, the judge upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."

K.S.A. 60-407(*f*) provides that all relevant evidence is admissible unless otherwise provided by statute. Was the proffered evidence in the instant case relevant? We think not.

"Punitive damages are imposed by way of punishing a party for malicious or vindictive acts or for a willful and wanton invasion of another party's rights, the purpose being to restrain him and to deter others from the commission of like wrongs." *Henderson v. Hassur,* 225 Kan. 678, Syl. ¶ 9, 594 P.2d 650 (1979).

In *Will v. Hughes,* 172 Kan. 45, Syl. ¶ 10, 238 P.2d 478 (1951), we held:

"In assessing exemplary damages the nature, extent and enormity of the wrong, the intent of the party committing it, *and generally, all the circumstances attending the particular transaction involved,* including any mitigating circumstances which may operate to reduce without wholly defeating such damages, *may be considered.*" (Emphasis added.)

In Restatement (Second) of Torts § 908 (1977), we find:

"(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

"(2) Punitive damages may be awarded for conduct that is outrageous, because

of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant."

25A C.J.S., Damages § 159 at page 68 states in part:

"Evidence of other acts of the defendant, either preceding or following the particular acts alleged and for which damages are sought, is admissible if so connected with the particular acts as tending to show defendant's disposition, intention, or motive *in the commission of the particular acts* for which damages are claimed." (Emphasis added.)

Other states have had occasion to consider the admissibility of settlement offers and negotiations or other post-event occurrences in relation to the issue of punitive damages, and as might be expected, there is no unanimous agreement on the issue.

In *Byers v. Santiam Ford, Inc.*, 281 Or. 411, 574 P.2d 1122 (1978), the buyer of an automobile brought an action against the seller to recover actual and punitive damages for fraud and violations of the Oregon Unfair Trade Practices Act. Defendant attempted to settle the case prior to trial but was unsuccessful, and during trial wanted to introduce evidence of the settlement offers contending it was relevant on the issue of punitive damages. The court stated:

"*Evidence of the parties' conduct subsequent to the event,* which produces plaintiff's claim for punitive damages, whether aggravating or mitigating, *must be probative of the defendant's state of mind at the time of the transaction.* [Citation omitted.]

. . . .

"In the case here at issue the evidence of contrition and a conciliatory attitude of one of defendant's agents after the complaint was filed has scant relevance respecting the state of mind of other agents of defendant at the time the car was sold to plaintiff. Assuming the evidence established the good faith and good will of defendant's president toward plaintiff, such conduct came as a response to the complaint, which prayed for substantial punitive damages. The evidence shows a desire to 'buy peace' and minimize the risk of an award of punitive damages and not that defendant dealt in good faith with plaintiff in selling the car." pp. 416-17. (Emphasis added.)

In *Forquer v. Pinal County,* 22 Ariz. App. 266, 526 P.2d 1064 (1974), an action involving an automobile collision, the issue did not involve settlement negotiations but did revolve around certain post-accident conduct of the defendant. The court, in considering the nature of a claim for punitive damages, stated:

"The concept of punitive damages is to punish the wrongdoer, over and above

the rendition of pecuniary damages, for his 'aggravated, wanton, reckless or maliciously intentional wrongdoing.' [Citation omitted.] Thus, it is the quality of the character of the tortious act itself which gives rise to the assessing of punitive damages, not the character of the wrongdoer, unless that personal character is material and relevant to the manner in which the tortious act was committed. [Citation omitted.] It follows that *acts of the wrongdoer occurring after the liability-creating event are normally not material on the issue of punitive damages unless such acts constitute evidence as to either the manner in which the liability-creating event occurred or to the aggravation of the victim's injuries.*

. . . . .

"However, in those cases allowing the after-occurring conduct to be admitted on the issue of punitive damages, the conduct has a reasonable relationship either to the state of mind of the tortfeasor *at the time of the event itself* or to the injured parties' actual damages. Therefore, after-occurring conduct not related to these matters, such as failing to file an accident report, is inadmissible on the issue of punitive damages." pp. 269-70. (Emphasis added.)

In *Charles F. Curry and Company v. Hedrick,* 378 S.W.2d 522 (Mo. 1964), plaintiff wanted evidence of the defendant's conduct after he had converted an airplane admitted on the issue of punitive damages. Defendant argued that if he had converted the airplane on a particular date and was required to answer in damages for it, then whatever he did with the property after that date was his own business. The court, however, disagreed and said:

"Evidence is considered relevant if the fact it tends to establish tends in turn to prove or disprove a fact in issue, or to corroborate evidence which is relevant and which bears on the principal issue. [Citations omitted.] Evidence of other acts of defendant than those alleged for which damages are sought, both preceding as well as following the particular acts, is admissible under an issue of exemplary damages *if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts* for which damages are claimed." p. 536. (Emphasis added.)

See also *Lemer v. Boise Cascade, Inc.,* 107 Cal. App. 3d 1, 11, 165 Cal. Rptr. 555 (1980).

Other courts have admitted settlement offers or other post-occurrence events under certain circumstances. In *Fenters v. Fenters,* 238 Ga. 131, 231 S.E.2d 741 (1977), the court held that, contrary to the general prohibition, evidence concerning settlement negotiations was relevant to an ex-husband's responsibility for his former spouse's attorney's fees.

In *Lawrence v. Boles,* 631 S.W.2d 764 (Tex. Civ. App. 1981),

the court was also faced with the effect of settlement offers upon the award of attorney fees.

"The trustee contends that this testimony by Boles on the attorney's fee issue was inadmissible because it was an 'offer to compromise' a dispute. Offers to settle or compromise a suit are usually excluded at trial because it is the public policy of the law to encourage the settlement of controverted claims. See Ray, Law of Evidence, § 1142 (1980), and cases cited therein. In the instant case, Boles offered the testimony as evidence that the suit was filed unnecessarily. There was no policy reason for excluding the testimony, and the trial court did not err in admitting it.

"In other words, the reason for excluding settlement offers from evidence is to protect the party offering to settle from having such offers introduced against him at trial. The judicial system should encourage settlements, yet the introduction of settlement offers would tend to discourage the same. However, here it was the party offering to settle the dispute who introduced the evidence as a defense against the imposition of attorney's fees. We think the evidence was properly admitted and supported the jury's finding on the reasonable value of the attorney's fees." p. 769.

While not having specifically addressed the issue before us, we have in many cases adopted the position that in considering punitive damages all relevant evidence surrounding the event or occurrence which gave rise to the claim is admissible. The position was recently iterated in *Slough v. J.I. Case Co.*, 8 Kan. App. 2d 104, 650 P.2d 729, *rev. denied* 232 Kan. 876 (1982):

"In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and *all circumstances attending the transaction involved should be considered.* Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses, including attorney fees." Syl. ¶ 8. (Emphasis added.)

Many elements enter into settlement negotiations and offers which have no bearing whatsoever on the culpability of the defendant for the alleged wrongful conduct. Availability of witnesses or other critical evidence, the financial condition of the parties, expense of litigation, possible adverse publicity and the possible generation of other claims are just a few things that come to mind which might encourage settlement offers but bear no relevant relationship to the awarding of punitive damages. Considering the underlying policy behind the granting of punitive damages, that is, punishment and deterrence, we think the rule adopted by the Oregon court is the better approach to the issue. Absent unusual circumstances, not shown in this case, we hold settlement offers and negotiations are inadmissible in

evidence even when offered for the limited purpose of defending against an award of punitive damages. The trial court did not commit error in excluding the proffered evidence.

Finally, Orkin makes numerous allegations of error based upon the judgment for actual and punitive damages granted the Hohnbaums, including (1) insufficient evidence of fraud; (2) no showing of actual damages; (3) error in the instructions; (4) conduct of the Hohnbaums; and (5) the verdict was influenced by passion and prejudice of the jury. The actual damages awarded were $410.00, the amount paid by the Hohnbaums for the 1976 inspection, treatment and continuing retreatment contract. It would serve no useful purpose to detail at length the voluminous evidence in this case upon which the jury may have found Orkin committed fraud. We have considered all of the contentions raised by Orkin, find them to be without merit, and, certainly, the amount of the judgments rendered herein does not shock the conscience of the court. Orkin is fortunate that the Hohnbaums did not seek to amend the pretrial order and questionnaire to ask for more than $10,000.00 punitive damages and that the actual jury award was therefore reduced accordingly.

In view of the decision reached herein, plaintiff's request to dismiss her appeal is granted and the other appeals are found to be moot.

The judgments are affirmed.