959 F.2d 245
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 Eldon L. BERGESON, individually and as administrator of the
estate of Sheryl L. Bergeson, deceased, Plaintiff-Appellee,
v.
Edward K. DILWORTH and Nathan O. Dilworth, Defendants-Appellants.
 No. 90-3170.
 United States Court of Appeals, Tenth Circuit.
 March 30, 1992.
 
 Before HOLLOWAY, BALDOCK and SETH, Circuit Judges.
 BALDOCK, Circuit Judge.
 
 
 1
 Defendants-appellants, Edward K. Dilworth ("Edward") and Nathan O. Dilworth ("Nathan"), appeal from a judgment entered against them in a diversity action for the wrongful death of Sheryl L. Bergeson ("Sheryl") resulting from an automobile collision. We have jurisdiction under 28 U.S.C. § 1291. We affirm.
 
 
 2
 Defendants worked together as general contractors under the name Ed Dilworth Construction ("EDC"). In September 1986, EDC had two contracts with the Army Corps of Engineers for construction work near Marion Lake and Cherryvale, Kansas. Both contracts listed Edward and Nathan as co-owners of EDC.
 
 
 3
 On the evening of September 4, 1986, Defendants jointly decided to move their construction equipment from the Marion Lake job to the Cherryvale job. Defendants loaded a backhoe weighing over five tons on a homemade, twenty-foot trailer attached to three-quarter ton Ford pickup.[1] The hitch ball on the pickup was loose due to earlier wear. Additionally, the brake shoes on the wheels attached to two of the three trailer axles had been removed rendering the trailer brakes inoperative. Both Defendants were aware of the condition of the hitch and trailer brakes yet proceeded to use the trailer and pickup to haul the backhoe.
 
 
 4
 At approximately 9:30 p.m., Defendants left Marion and proceeded on U.S. Highway 77.[2] Edward drove a Freightliner tractor pulling a 28-30 foot end-dump rock trailer. Nathan followed, approximately fifty feet behind, in the pickup pulling the trailer and backhoe. Edward maintained visual contact in his rear-view mirror with the pickup truck. A driver who passed the caravan prior to the collision testified that the trailer attached to the pickup driven by Nathan was weaving over the center line. As the pickup came over a hill, the ball on the trailer hitch broke leaving the trailer attached solely by the safety chains and causing the trailer to swerve across the center line. Unfortunately, Sheryl was driving in opposite direction, and she collided with the trailer as she came over the top of the hill. She died shortly thereafter as a result of injuries sustained in the collision.
 
 
 5
 Plaintiff-appellee, Eldon L. Bergeson, brought this action seeking compensatory and punitive damages. Shortly before trial, Nathan admitted liability but disputed the amount of compensatory damages and the appropriateness of punitive damages. Edward denied liability as well as disputing the damages.
 
 
 6
 At trial, the district court permitted two letters written by Edward to be read into the record over Defendants' objection. The first, dated September 25, 1987, from Edward to Plaintiff's counsel, indicated that Sheryl was at fault in the collision. Specifically, Edward stated in the letter that Sheryl came at Edward (who was driving the Freightliner), that he witnessed the collision in the rear view mirror, and that "Sheryl ... was either asleep or putting cassette tapes in to play, or was trying to commit suicide." Edward also admitted ownership of the pickup truck, and stated that he would hold Sheryl and Plaintiff's counsel liable for the damage to the pickup. The second letter, dated April 22, 1988, was from Edward to Robert Laughridge, a motorist who collided with the pickup truck driven by Nathan shortly after the collision with Sheryl's car. This letter stated that the first group of police officers who investigated the collision were intoxicated, apparently attempting to discredit the police report prepared by these officers which exonerated Laughridge of fault for the subsequent collision. The letter also indicated that Edward and Nathan believed that Laughridge was drunk. The letter requested payment for damages to the pickup. The district court instructed the jury that the letters could be considered on the issue of Edward's credibility, and could be considered in determining the state of mind or knowledge of Defendants at the time of and prior to the collision. I R. doc. 66 (instruction no. 19).
 
 
 7
 The jury was instructed on seven theories of negligence based on Defendants' conduct.[3] I R. doc. 66 (instruction no. 2). The district court also instructed the jury that Plaintiff had claimed punitive damages against Defendants because of gross and wanton negligence in doing at least one of the seven acts. Id. Two theories of vicarious liability were also submitted to the jury. First, the court instructed on a "business enterprise joint venture" theory which provides that the actions of one party in the enterprise are considered the actions of the other.[4] Id. (instruction no. 16). Second, the court instructed on a partnership theory which provides that each partner is liable for the acts of another partner.[5] Id. (instruction no. 17). The court instructed the jury that it had to find either a partnership or a business enterprise in order to "find[ ] liability for actual and/or punitive damages as to the named defendants in this case...." Id. (instruction no. 18). The jury was also given a specific instruction on punitive damages.[6] See id. (instruction no. 25). Additionally, the jury was instructed that it was not required "to assess damages against each defendant individually."[7] Id. (instruction no. 26).
 
 
 8
 The jury returned a special verdict holding both Defendants liable for compensatory and punitive damages. The special verdict specifically found that Edward and Nathan "were members of a business enterprise on the date of the accident," and that Nathan's acts "were in furtherance of the business enterprise." I R. doc. 68. The special verdict also specifically found that "the defendants acted in a wanton manner on the date of the accident," and that "punitive damages should be assessed against the defendants." Id. Plaintiff was awarded $256,795 in compensatory damages[8] and $500,000 in punitive damages. In a published opinion, the district court denied Defendants' motion for a remittitur of the punitive damages. See Bergeson v. Dilworth, 738 F.Supp. 1361 (D.Kan.1990).
 
 
 9
 On appeal, Defendants contend that the district court erred in admitting the letters written by Edward which Defendants claim were irrelevant and so prejudicial that a new trial on compensatory and punitive damages is required. Additionally, Edward contends that the district court erred by instructing the jury on a theory of vicarious liability for punitive damages, and that he was entitled to a directed verdict on the issue of punitive damages.
 
 I.
 
 10
 We review the district court's ruling on the admissibility of the evidence for an abuse of discretion. K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1155 (10th Cir.1985); Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp., 571 F.2d 1144, 1149 (10th Cir.), cert. denied, 439 U.S. 862 (1978).[9] "The admissibility of evidence in diversity cases in federal court is generally governed by federal law." Romine v. Parman, 831 F.2d 944, 944 (10th Cir.1987) (citations omitted). "[T]he Federal Rules of Evidence should be applied in a diversity case in federal court to determine whether evidence is relevant or prejudicial." Id. at 945. Under the Federal Rules of Evidence, all evidence which has any tendency to make a material fact more or less probable is considered relevant and is admissible "except as otherwise provided by the Constitution of the United States, by Act of Congress, by the[ ] [Federal] [R]ules [of Evidence], or by other rules prescribed by the Supreme Court pursuant to statutory authority." Fed.R.Evid. 401, 402. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Id. 403.
 
 
 11
 Defendants contend that the letters were not relevant to their state of mind at the time of and prior to the collision because Edward wrote them over a year later. Defendants rely on O'Gilvie v. International Playtex, Inc., 821 F.2d 1438 (10th Cir.1987), cert. denied, 486 U.S. 1032 (1988), for the proposition that a defendant's subsequent conduct is irrelevant to the issue of punitive damages.[10] O'Gilvie is distinguishable on several grounds. First, at issue in O'Gilvie was the propriety of a remittitur, not the admissibility of evidence. Second, the subsequent conduct there occurred post-trial whereas the subsequent conduct here occurred after the incident giving rise to liability but before trial. Moreover, the specific language in O'Gilvie on which Defendants rely expressly states that our determination as to lack of relevance was particular to that case. In short, O'Gilvie simply does not stand for the broad proposition that Defendants would like.[11]
 
 
 12
 The district court indicated that Edward's accusations in the April 22 letter that the investigating officers and Laughridge were intoxicated, and his attempt to place fault with Sheryl by stating that she was "asleep, or putting cassette tapes in to play, or was trying to commit suicide" in the September 25 letter could lead the jury to properly infer that he was attempting to conceal his knowledge of the danger existing at the time of the accident. Bergeson, 738 F.Supp. at 1364 (citations omitted). Evidence of other acts may be admissible to show knowledge. Fed.R.Evid. 404(b). The fact that the other conduct occurred subsequent to the event giving rise to liability does not make it any less admissible. See Eaves v. Penn, 587 F.2d 453, 464 (10th Cir.1978) (evidence of defendant's subsequent conduct admissible under Rule 404(b) to show defendant's intent at time of alleged breach of fiduciary duty). Here, Edward's attempt to place fault with Sheryl and his accusations that Laughridge and the investigating officers were intoxicated similarly shows an intent to conceal his knowledge of the circumstances giving rise to liability. See United States v. Cook, 745 F.2d 1311, 1317-18 (10th Cir.1984) (evidence that defendant misidentified himself to police officers admissible to prove defendant's earlier intent, plan or absence of mistake or accident in committing crime), cert. denied, 469 U.S. 1220 (1985). Furthermore, Edward's admission in the letter to witnessing the accident is clearly probative evidence of his knowledge. Thus, the district court did not abuse its discretion in determining that the letters were relevant to Edward's knowledge.
 
 
 13
 Nor did the district court abuse its discretion in concluding the probative value of the letters was not "substantially outweigh[ed]" by their unfair prejudice. See Fed.R.Evid. 403. "The exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used sparingly." K-B Trucking, 763 F.2d at 1155 (internal quotation omitted). " '[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.' " Dollar v. Long Mfg., 561 F.2d 613, 618 (5th Cir.1977), cert. denied, 435 U.S. 996 (1978).
 
 
 14
 Defendants argue that the letters were unfairly prejudicial because Edward's statements which attempted to attribute fault to Sheryl were not only false, but they were cruel and thoughtless. Defendants suggest that the jury likely awarded damages, at least in part, based on Edward's cruel and thoughtless conduct subsequent to the collision. Defendants' argument assumes that the jury could not follow the district court's limiting instruction that the evidence could be properly considered only on the issue of Defendants' state of mind at the time of or prior to the collision. We, however, assume the contrary. See United States v. Cardall, 885 F.2d 656, 667 (10th Cir.1989) ("[t]he assumption that juries can and will follow the instructions they are given is fundamental to our system of justice") (citation omitted). Moreover, we simply cannot accept Defendants' claim that the evidence was unfairly prejudicial when the prejudicial nature of the evidence was due entirely to Defendants' pretrial conduct specifically related to the dispute. This factor, makes the evidence all that more probative as to Edward's state of mind at the time of the collision. Accordingly, we do not find that the district court abused its discretion in admitting the letters.
 
 II.
 
 15
 "[A]n error in the jury instructions will mandate reversal only if the error is determined to have been prejudicial, based on a review of the record as a whole." Durflinger v. Artiles, 727 F.2d 888, 895 (10th Cir.1989) (internal quotations omitted). The instructions must "state the law which governs and provide[ ] the jury with an ample understanding of the issues and the standards applicable." Ramsey v. Culpepper, 738 F.2d 1092, 1098 (10th Cir.1984).
 
 
 16
 Edward contends that the district court erred by instructing the jury that it could award punitive damages against him based on a theory of vicarious liability. Edward's contention is addressed to language in instruction number 26 that "any" liability attributable to him was "dependent ... [on] the existence of a business enterprise" and the jury was therefore "not required to assess damages against each defendant individually." See supra note 7. Edward contends that this instruction permitted the jury to assess punitive damages against him based on a theory of vicarious liability--i.e., Edward could be liable for punitive damages based solely on Nathan's conduct.
 
 
 17
 In reviewing jury instructions, we must "consider all that the jury heard and ... decide not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues." Durflinger, 727 F.2d at 888. Contrary to Edward's contention, we do not believe that the particular language to which he points us misled the jury in such a manner as to require reversal.
 
 
 18
 Initially, we note that Kansas law is unsettled on the issue of whether punitive damages may be imposed vicariously on partners or members of a business enterprise for the actions of their copartners. According to Edward, "the very theory of vicarious liability applied by the district court in this case" was rejected by the Kansas Supreme Court in Kline v. Multi-Media Cablevision, 666 P.2d 711 (Kan.1983). At issue in Kline was whether a corporation may be held liable for punitive damages arising from an act of an agent or employee. The court adopted the minority position on this issue known as the "complicity rule:"
 
 
 19
 Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
 
 
 20
 (a) the principal or the managerial agent authorized the doing and the manner of the act, or
 
 
 21
 (b) the agent was unfit and the principal or managerial agent was reckless in employing or retaining him, or
 
 
 22
 (c) the agent was employed in a managerial capacity and was acting in the scope of the employment, or
 
 
 23
 (d) the principal or a managerial agent of the principal ratified or approved of the act.
 
 
 24
 Id. at 714, 716 (quoting Restatement (Second) of Torts § 909 (1977)). Despite the rule being "couched in terms of master's and principal's liability," the court recognized that "the rules are equally applicable to corporations." Id. at 716.
 
 
 25
 Contrary to Edward's argument, the "complicity rule" is not an absolute bar to imposing punitive damages on one party based on the tortious conduct of another party. A principal will be liable for punitive damages for tortious acts of his agent which he authorized, ratified or approved. Moreover, a principal is liable for punitive damages for the tortious acts of managerial agents done in the course of their employment. See Gould v. Taco Bell, 722 P.2d 511, 517-18 (Kan.1986). Defendants' argument conveniently overlooks these exceptions to the general policy against imposing vicarious liability for punitive damages and boldly asserts, citing no authority, that this general policy applies to a joint venturer's or partner's liability for punitive damages based on the tortious acts of a copartner.
 
 
 26
 Edward completely ignores or overlooks that Kansas has adopted the provision of the Uniform Partnership Act ("UPA") which holds a partnership liable for the acts of one of the partners in the ordinary course of the partnership's business or with the authority of his copartners.[12] Kan.Stat.Ann. § 56-313 (1983). This section expressly provides that the partnership is liable for "any penalty" that may be incurred. Id. Under Kansas law, punitive damages are intended as a penalty as their purpose is "to punish the wrongdoer" and "to serve as an example to restrain and deter others" from committing willful, malicious or wanton invasions of another person's rights. Kline, 666 P.2d at 713. See also Wooderson v. Ortho Phamaceutical Corp., 681 P.2d 1038, 1061 (Kan.), cert. denied, 469 U.S. 965 (1984). Given that "[a]ll partners are liable jointly and severally for everything chargeable to the partnership" Kan.Stat.Ann. § 56-315 (1983), and that the partnership is liable for penalties incurred by a partner for acts done in the course of the partnership's business, Kansas may impose different rules for vicarious liability for punitive damages based on the nature of the business relationship. Indeed, several other states that have adopted the vicarious liability provisions of the UPA recognize that partners may be vicariously liable for punitive damages based on acts of their copartners done in the course of the partnership's business. See, e.g., Shetka v. Kueppers, Kueppers, VonFeldt & Salmen, 454 N.W.2d 916, 918-19 (Minn.1990); Rogers v. Hickerson, 716 S.W.2d 439, 447 (Mo.App.1986); Meleski v. Pinero Int'l Restaurant, 424 A.2d 784, 790-92 (Md.App.1981); Spencer v. Steinbrecher, 164 S.E.2d 710, 716 (W.Va.1968). But see Husted v. McCloud, 450 N.E.2d 491, 494-95 (Ind.1983) ("rationale behind punitive damages ... prohibits awarding such damages against an individual who is personally innocent of any wrongdoing").
 
 
 27
 Imposing liability for punitive damages on members of a partnership or business enterprise based on the tortious conduct of copartners acting in the course of the partnership's business is consistent with the complicity rule adopted in Kline. The complicity rule permits imposition of vicarious liability for punitive damages on the principal for tortious acts of its managerial agents. Gould, 722 P.2d at 517-18. Kansas defines a partnership as "an association of two (2) or more persons to carry on as co-owners of a business for profit." Kan.Stat.Ann. § 56-306(a) (1983). "Every partner is an agent of the partnership for the purpose of its business...." Id. § 56-309(a). Because partners are by definition co-owners of a business for profit, each partner is essentially a managerial agent of the partnership. Thus, the complicity rule appears to support the proposition that a partner may be vicariously liable for punitive damages based on the acts of his copartner.
 
 
 28
 Nevertheless, we need not decide how Kansas courts would determine this issue because we believe that the instructions, when considered in their entirety, required the jury to base Edward's liability for punitive damages on his individual conduct. Plaintiff alleged and the jury was instructed that Defendants' gross and wanton negligence was the basis for the punitive damage claim. The jury was instructed on seven theories of negligence and given specific instructions defining negligence and standards of care. These instructions, at least in part, pertained to Edward's liability for his own conduct and, given that Nathan admitted liability, would have been entirely superfluous if a vicarious liability theory was the sole basis of Edward's liability.
 
 
 29
 Moreover, the specific instruction on punitive damages informed the jury that liability was dependent on individual conduct. See supra note 6. The district court told the jury that punitive damages may be awarded "if the jury finds the defendant or defendants have been guilty of oppression, fraud, or malice, actual or presumed." The jury was told that "the basis for allowance of punitive damages" is to "punish the offender." In instructing the jury that malice and evil intent may be presumed from evidence of recklessness and wanton disregard of another's rights, the court specifically instructed the jury that "[i]f a defendant is grossly and wantonly reckless in exposing others to danger, the law holds him to have intended the natural consequences of his acts, and treats him as guilty of a willful wrong."[13]
 
 
 30
 The instructions, when considered together, adequately apprised the jury that Edward's liability for punitive damages must be based on his own conduct. Substantial evidence was presented at trial that Edward acted not only in concert with Nathan, but that his individual acts of loading a five ton backhoe on a trailer without brakes and a faulty hitch and permitting it to be hauled down a two-lane road at night were wanton.
 
 
 31
 We recognize that the jury was instructed that "[f]or the purposes of finding liability for actual and/or punitive damages as to the named defendants in this case," it must find that a business enterprise or partnership existed at the time of the collision. However, we do not read this instruction, when considered in the context of all the instructions, as permitting the jury to find Edward vicariously liable for punitive damages. Rather, if anything, the instructions were more deferential to Defendants than was required, as the jury was instructed that it must find both wanton conduct by Edward and a business enterprise in order to find him liable for punitive damages. Moreover, we do not read the instruction that it was "unnecessary ... to assess damages against each defendant individually," as permitting the imposition of vicarious liability for punitive damages. Rather, we read this instruction as stating that, if the jury found Defendants liable, it need not apportion damages between them. This is a correct statement of Kansas law on joint and several liability for partners. See Kan.Stat.Ann. § 56-315 (1983).
 
 
 32
 Finally, while the jury's special verdict found that a business enterprise existed and Nathan's acts furthered the enterprise, it also found that "defendants acted in a wanton manner." Therefore, even if we read the instructions as permitting the imposition of punitive damages on Edward based on Nathan's acts, and even if this is an improper statement of Kansas law, the error did not prejudice Edward because the jury found that he acted in a wanton manner.
 
 
 33
 AFFIRMED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 Defendants had never hauled the backhoe on this trailer nor had they ever attempted to pull the trailer with the pickup
 
 
 [2]
 Highway 77 is a two-lane road with no emergency shoulders on either side
 
 
 [3]
 The seven theories of negligence were as follows: (1) driving a motor vehicle pulling a homemade trailer left of center, contrary to K.S.A. 8-1515, 1519, 1522 and 1907; (2) causing or prmitting a homemade trailer to whip or travel into the wrong traffic lane and collide with Sheryl Bergeson's vehicle; (3) driving a motor vehicle pulling a homemade trailer in a careless and reckless manner; (4) driving at a speed higher than was reasonable and prudent under the conditions existing (K.S.A. 8-1557); (5) failing to keep their vehicles under proper control; (6) failing to keep a proper lookout; and, (7) towing a homemade trailer using a hitch insufficient to pull, stop, and hold all weight pulled, and not designed to insure that the towed vehicle would follow in the path of the towing vehicle in a straight line, contrary to K.S.A. 8-1907. I R. doc. 66 (instruction no. 2)
 
 
 [4]
 This instruction stated:
 There are several principles or theories of Kansas law by which two or more persons may have liability for the action of the other person or persons. One such principle of law is known as the "business enterprise joint venture," where the actions of one party in the enterprise are considered the actions of the other party in the business enterprise. Under this principle of law each party is the agent of the other if the action taken was in furtherance of their mutual agreement to engage in the business enterprise or enterprises. Such an agreement may be found in the mutual acts of the parties before, during and after an event upon which liability is claimed.
 Although no single act or conduct is determinative, among those acts or conduct that may indicate a business enterprise joint venture are:
 
 
 [1]
 The joint ownership and/or control of property used in the enterprise;
 
 
 [2]
 The sharing of expenses, profits and loss, and having and exercising some voice in determining the division of the net earnings;
 
 
 [3]
 A community of control over and active participation in the management and direction of the business enterprise;
 
 
 [4]
 The intention of the parties, express or implied; and
 
 
 [5]
 The fixing of salaries or withdrawals of money from the enterprise by joint agreement
 I R. doc. 66 (instruction no. 16).
 
 
 [5]
 This instruction stated:
 Plaintiff also contends that the two named defendants, along with others, were partners engaged in the construction business, and hence under law each partner is liable for the acts of every other partner. Each partner is the agent of the other partner engaged in activity of the partnership. Kansas statutory law (K.S.A. 56-306) defines a partnership as:
 "A partnership is an association of two (2) or more persons to carry on as co-owners a business for profit."
 K.S.A. 56-307(d) further provides:
 "An agreement to be partners need not be in writing and may be proven by the conduct of the parties. The receipt by a person of a share of the profits of business in prima facie evidence that he or she is a partner in the business."
 In essence, a partnership, like a joint venture, is a form of business enterprise. Usually a partnership is a continuing business relationship, whereas a joint venture often relates to a relationship for a particular business enterprise.
 I R. doc. 66 (instruction no. 17).
 
 
 [6]
 This instruction stated:
 In any action like the one before you, the jury may give damages for the sake of example and by way of punishment, if the jury finds the defendant or defendants have been guilty of oppression, fraud, or malice, actual or presumed. These damages are called in legal parlance exemplary or punitive damages.
 The basis for allowance of punitive damages rests upon the principle of punishment to the offender for the general benefit of society, both as a restraint upon the transgressor and as a warning and example to deter the commission of like acts in the future.
 Punitive damages are not limited to cases where there is direct evidence of fraud, malice or gross negligence. They may be allowed when there is evidence of such recklessness and wanton disregard of another's rights that malice and evil intent will be inferred. If a defendant is grossly and wantonly reckless in exposing others to danger, the law holds him to have intended the natural consequences of his acts, and treats him as guilty of willful wrong.
 To constitute willful or wanton negligence sufficient to justify an award of punitive damages, it is not necessary that there exist ill will toward the persons injured, or specific intent to inflict the injury. If an act that caused harm to the plaintiff was the result of, or accompanied with, such gross negligence or reckless disregard of another's rights, manifesting an indifference to the consequences of the act or acts, so that malice may be inferred, then an award of punitive damages is appropriate.
 If you find that the conduct of a defendant caused or contributed to cause plaintiff's injuries in this matter, fits within this definition, you may award punitive damages in this case. Any punitive damages that you award must bear some relationship to the amount of actual damages awarded.
 I R. doc. 66 (instruction no. 25).
 
 
 [7]
 This instruction stated:
 The defendant, Nathan O. Dilworth, has admitted liability for any injury and all compensatory damages which may have resulted to the estate of Sheryl L. Bergeson and to her heirs from the occurrence in question. He has denied liability for any punitive damages.
 Defendant Edward K. Dilworth denies liability for both compensatory and punitive damages.
 As stated elsewhere in these instructions, any liability on the part of Edward K. Dilworth is dependent upon your findings as to the existence of a business enterprise. It is therefore unnecessary for you to assess damages against each defendant individually.
 I R. doc. 66 (instruction no. 26).
 
 
 [8]
 The special verdict returned by the jury awarded Plaintiff $406,795.33 in compensatory damages, of which $250,000 represented nonpecuniary damages on the wrongful death action. The district court reduced the nonpecuniary damages to the $100,000 statutory maximum. See Kan.Stat.Ann. § 60-1903(a) (Supp.1990)
 
 
 [9]
 Even if the district court abuses its discretion by erroneously admitting particular evidence, we will not reverse a judgment when the error is harmless--i.e. when the error does not affect a substantial right of the party asserting error. K-B Trucking, 763 F.2d at 1156. See also Fed.R.Civ.P. 61; Fed.R.Evid. 103(a). "[T]he burden of demonstrating that substantial rights were affected rests with the party asserting error." K-B Trucking, 763 F.2d at 1156
 
 
 [10]
 O'Gilvie addressed the propriety of a district court's remittitur of a punitive damage award based on a subsequent remedial act by the defendant. Without the plaintiff's consent, the district court reduced a $10 million punitive damage award in a product liability action to $1.35 million due to the defendant's removal of the product from the market, despite the district court's finding that there was sufficient evidence to support the amount of punitive damages, that the award was intelligently drawn not out of passion or prejudice, and that the award was not so excessive as to shock the conscious. We recognized that a remittitur was "not proper unless the amount of damages awarded is so excessive that it shocks the judicial conscience," and held that "[t]he trial court's action ... violated this standard both because it expressly found that the award did not shock the judicial conscience and because it based its decision to remit on events occuring after trial." Id. at 1448-49 (footnote omitted). We concluded that "because the post-trial conduct upon which the trial court relied in ordering remittitur in this case had no relevance to the injurious conduct underlying the claim for punitive damages, the court was without authority under either state or federal law to reduce the award on that basis." Id. at 1450 (emphasis added)
 
 
 [11]
 Defendants also direct us to Ettus v. Orkin Exterminating Co., 665 P.2d 730 (Kan.1983), to support their claim that subsequent conduct is not relevant to a person's state of mind at the time of the incident giving rise to liability. Notwithstanding that we look to federal rather than state law in determining relevancy questions, Romine, 831 F.2d at 945, we similarly do not read Ettus for the broad proposition argued by Defendants. Ettus held that "[a]bsent unusual circumstances ... settlement offers and negotiations are inadmissible in evidence even when offered for the limited purpose of defending against an award of punitive damages." 665 P.2d at 743. Critical to the court's holding was its recognition that "[m]any elements enter into settlement negotiations which have no bearing whatsoever on the culpability of the defendant for the alleged wrongful conduct." Id. The court recognized that subsequent conduct is admissible on the issue of punitive damages when it is probative of the defendant's state of mind at the time of the event giving rise to liability. Id. at 741, 744 (citing with approval Byers v. Santiam Ford, Inc., 574 P.2d 1122 (Or.1978))
 
 
 [12]
 Specifically, Kansas law provides:
 Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his or her copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.
 Kan.Stat.Ann. § 56-313 (1983) (emphasis added).
 
 
 [13]
 Defendants proposed an alternative instruction which sought to limit liability for punitive damages solely to Nathan. I R. doc. 64