821 F.2d 1438
 56 USLW 2044, Prod.Liab.Rep.(CCH)P 11,428
 Kelly M. O'GILVIE, individually, and as Administrator of the
Estate of Betty L. O'Gilvie, deceased; and Stephanie L.
O'Gilvie, a minor, and Kevin M. O'Gilvie, a minor, By and
Through Kelly M. O'Gilvie, their father and natural
guardian, Plaintiffs-Appellants, Cross-Appellees,
v.
INTERNATIONAL PLAYTEX, INC., Defendant-Appellee, Cross-Appellant,
Motor Vehicle Manufacturers Association, Inc., Product
Liability Advisory Council, Inc., and Gulf & Great
Plains Legal Foundation, Amici Curiae.
 Nos. 85-1861, 85-1887.
 United States Court of Appeals,
Tenth Circuit.
 June 18, 1987.
 
 Gerald L. Michaud of Michaud, Cordry, Michaud, Hutton & Hutton (Mark B. Hutton, with him on the brief, Donald S. Andersen and Marlys A. Marshall, of counsel), Wichita, Kan., for plaintiffs-appellants, cross-appellees.
 Charles M. McCaghey of Olwine, Connelly, Chase, O'Donnell & Weyher, New York City (Glenn J. Pogust and Grace M. Healy of Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, and Larry W. Wall of Stratton, Russell, Toomey & Wall, Wichita, Kan., of counsel), for defendant-appellee, cross-appellant.
 Aaron D. Twerski, Professor of Law, Hofstra University School of Law, Hempstead, N.Y., Marc R. Brosseau of Weller, Friedrich, Hickisch, Hazlitt & Ward, Denver, Colo. (William H. Crabtree and Edward P. Good, Motor Vehicle Manufacturers Ass'n of the United States, Detroit, Mich., of counsel), filed a brief on behalf of amici curiae Motor Vehicle Manufacturers Ass'n, Inc. and Product Liability Advisory Council, Inc.
 Jerald L. Hill and Mark J. Bredemeier of Gulf & Great Plains Legal Foundation, Kansas City, Missouri, filed a brief on behalf of amicus curiae Gulf & Great Plains Legal Foundation.
 Before McKAY, SETH, and SEYMOUR, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 Kelly O'Gilvie brought this diversity action, individually and on behalf of the estate of his deceased wife Betty, against International Playtex, Inc. O'Gilvie alleged that Betty's use of Playtex super-absorbent tampons caused her death from toxic shock syndrome, and he sought damages from Playtex under the Kansas law of strict liability in tort. In answers to special interrogatories, the jury found that Playtex tampons had caused Mrs. O'Gilvie to develop toxic shock syndrome, and that Playtex had failed to adequately warn of the fatal risk of toxic shock from the use of its product. The jury awarded actual damages of $1,525,000,[1] and punitive damages of $10,000,000. After the entry of judgment and apparently in response to the trial court's suggestion, Playtex represented that it was discontinuing the sale of some of its products, instituting a program of alerting the public to the dangers of toxic shock syndrome, and modifying its product warning. The court thereupon ordered the punitive damage award reduced to $1,350,000.
 
 
 2
 Both parties have appealed. O'Gilvie contends that the court abused its discretion by reducing the amount of the punitive damages award. Playtex asserts: 1) it was entitled to a directed verdict because there was no evidence that the warning was inadequate or that it caused the injury; 2) the court erred in refusing to allow the jury to consider the fault of Betty O'Gilvie or the fault of other tampon manufacturers; and 3) the court erred in submitting the issue of punitive damages to the jury. We find no ground for disturbing the liability verdict against Playtex. We conclude, however, that the court's order reducing the punitive damage award must be reversed.
 
 I.
 
 3
 A review of the record reveals the following sequence of events. On Tuesday, March 29, 1983, Betty O'Gilvie attended hairdressing school all day. While there, she told a friend that she had had a sore throat and a vaginal yeast infection all weekend, and that she was going to call her doctor. Mrs. O'Gilvie's husband testified that he first became aware she was not feeling well on Wednesday morning, March 30. She told him she thought she had a cold or the flu. Mrs. O'Gilvie's sister, Cheryl Ballway, took Mrs. O'Gilvie to the office of her physician, Dr. Hays, the morning of March 30 for a 9:30 a.m. appointment. Although Ms. Ballway testified that Mrs. O'Gilvie said she was suffering from vomiting and diarrhea, the doctor testified that Mrs. O'Gilvie did not mention these symptoms to him. Mr. O'Gilvie testified that his wife did not have these symptoms at any time before she went to Dr. Hays.
 
 
 4
 When Mrs. O'Gilvie asked Dr. Hays about toxic shock syndrome, he assured her that she did not have it and diagnosed scarlet fever. Mrs. O'Gilvie's temperature rose to 105? by Wednesday evening, and Mr. O'Gilvie testified that she had more or less lost consciousness. He called Dr. Hays at about 10 p.m., and Dr. Hays reassured him that the scarlet fever was running its course. The doctor instructed him to continue giving Mrs. O'Gilvie aspirin, fluids, and the prescribed medication. Mrs. O'Gilvie's mother-in-law, who was caring for her, called Dr. Hays' office at about 9 a.m. Thursday, March 31. She did not speak with Dr. Hays and was told by office personnel to continue the treatment. Mrs. O'Gilvie's condition steadily deteriorated Thursday morning, and her mother-in-law called the office at 1:30 p.m. to report that Mrs. O'Gilvie's fingers were turning blue. Shortly thereafter Mrs. O'Gilvie was brought to the office, emergency measures were begun, and she was rushed to the hospital. She died Saturday, April 2, of toxic shock syndrome.
 
 II.
 
 5
 Playtex contends that it was entitled to a directed verdict because O'Gilvie presented no evidence that the warning accompanying its super-absorbent tampons was inadequate or that the warning was the cause of Mrs. O'Gilvie's injury. We disagree. A directed verdict is not proper if the record, viewed most favorably to the party opposing the motion, contains evidence upon which a reasonable jury could return a verdict for the nonmoving party. See Cockrell v. Boise Cascade Corp., 781 F.2d 173, 177 (10th Cir.1986); Mackey v. Burke, 751 F.2d 322, 325 (10th Cir.1984).
 
 
 6
 O'Gilvie argued at trial that the warning was inadequate because it did not properly apprise users of the causal connection between toxic shock and the use of tampons, or of the increased risk from the use of super-absorbent tampons.[2] The record contains substantial expert testimony that a causal link exists between toxic shock and the use of super-absorbent tampons such as the Playtex product at issue here. Experts also testified that the warning did not alert buyers to the increased risk from use of high-absorbency tampons, and that simply mentioning an association between toxic shock and tampon use did not adequately alert users to the cause and effect relationship. Indeed, Playtex' own expert, Dr. David Hall, testified that if Playtex tampons cause toxic shock, the Playtex package warning was inadequate. See rec., vol. 25, at 2690, 2721, 2723.
 
 
 7
 Playtex' argument that there is no evidence of a causal connection between the inadequacy of the warning and the injury is also without merit. Under Kansas law, an inadequate warning creates a presumption of causation. See Wooderson v. Ortho Pharmaceutical Corp., 235 Kan. 387, 681 P.2d 1038, 1057 (1984). This presumption, considered together with Kelly O'Gilvie's testimony on the consideration his wife would have given an adequate warning, was sufficient to send the causation issue to the jury.
 
 
 8
 Playtex also argues that its warning was adequate as a matter of law because it complied with Food and Drug Administration (FDA) regulations. In the alternative Playtex contends that the court's instruction on the effect of compliance with FDA requirements was erroneous. We are not presuaded by these arguments.
 
 
 9
 The district court instructed the jury as a matter of law that the Playtex package warning was in conformity with FDA regulations, and further instructed:
 
 
 10
 "If the warning on the product was, at the time of manufacture, in compliance with administrative regulatory safety standards relating to warnings or instructions, then such warning is evidence of due care, and the product shall be deemed not defective by reason of the warning or instructions, unless the plaintiff proves that a reasonably prudent manufacturer could and would have taken additional precautions.
 
 
 11
 "In other words, you are instructed that even if you find that defendant International Playtex met all government regulations and requirements, which are minimum standards, such compliance is not a defense if a reasonable and prudent manufacturer would have taken added precautions."
 
 
 12
 Rec., vol. 1, at 129.
 
 
 13
 On appeal, Playtex contends that the court erred in this instruction by characterizing the FDA requirements as minimum standards. This argument fails on two grounds. Although the record bristles with objections by everyone to virtually everything on every conceivable ground, Playtex did not object to this instruction on that ground. See, rec., vol. 29, at 3364-65. Moreover, the instruction is an accurate reflection of the law of Kansas. See Kan.Stat.Ann. Sec. 60-3304 (1983); Jones v. Hittle Serv., Inc., 219 Kan. 627, 549 P.2d 1383 (1976).
 
 
 14
 We also reject Playtex' argument that its compliance with FDA standards entitled it to judgment as a matter of law. Compliance is not dispositive under Kansas law if the plaintiff shows that a reasonable manufacturer would have done more. O'Gilvie presented ample evidence that mere compliance with the FDA standards was not adequate under the circumstances. The court therefore properly sent the issue to the jury.[3]
 
 III.
 
 15
 Playtex contends that it is entitled to a new trial because the district court refused to allow the jury to consider the issue of the comparative fault of Betty O'Gilvie or of other tampon manufacturers.
 
 A.
 
 16
 Playtex correctly points out that, under Kansas law, "all types of fault, regardless of degree, are to be compared with that of defendant whether the fault is characterized as contributory negligence, assumption of risk, product misuse, or unreasonable use. All of these defenses depend on the reasonableness of plaintiff's conduct, a negligence concept." Prince v. Leesona Corp., 720 F.2d 1166, 1171 (10th Cir.1983) (citing Kennedy v. City of Sawyer, 228 Kan. 439, 618 P.2d 788, 796-97 (1980)). Playtex argues that Mrs. O'Gilvie's fault should have been submitted to the jury because
 
 
 17
 "(1) She read and understood the warnings accompanying the Playtex tampons (Tr. 2511); (2) knowing this risk she chose to use tampons; (3) despite skepticism about Dr. Hays's diagnosis (Tr. 2513), she did not seek a second medical opinion; (4) after developing the symptoms associated with TSS she continued to use tampons (Tr. 2513); and, (5) she did not return to her doctor or see another doctor although the symptoms persisted and worsened."
 
 
 18
 Brief of Defendant-Appellee, Cross-Appellant at 22-23.
 
 
 19
 A plaintiff is contributorily negligent when his conduct is a contributing cause of the harm and falls short of that which a reasonable person would undertake for his own protection. See Allman v. Holleman, 233 Kan. 781, 667 P.2d 296, 300 (1983). The doctrine of assumption of the risk requires the defendant to "prove that the injured plaintiff (1) discovered the defect; (2) was aware of the danger; and (3) unreasonably continued to use the product." Prince, 720 F.2d at 1169. "Both doctrines require some knowledge of the danger or risk." Guerra v. Jaeger, 204 Kan. 309, 461 P.2d 737, 741 (1969). A defendant who seeks to reduce his percentage of fault by comparing it to the fault of another party has the burden of proving by a preponderance of the evidence that the party was at fault and that the fault caused or contributed to the injury. See Wooderson, 681 P.2d at 1058.
 
 
 20
 For purposes of assessing the evidence regarding Mrs. O'Gilvie's comparative fault, we must look separately at her conduct before her first visit to Dr. Hays, and her conduct after that time. Mrs. O'Gilvie's conduct after her initial visit to Dr. Hays could not give rise to a jury issue on her comparative fault because her continued use of tampons after the visit was not negligent as a matter of Kansas law. In Allman, the defendant claimed that the decedent had been contributorily negligent in taking birth control pills. The Kansas Supreme Court disagreed, pointing out that the decedent had taken the pills pursuant to a doctor's prescription.
 
 
 21
 "This fact, along with the widespread disregard of warning labels on packages, prohibits a finding of fault on the part of Ms. Allman. Even though there is a recognizable risk, conduct, to be negligent, must be unreasonable. Prosser, Law of Torts Sec. 31 (4th ed. 1971). As we are becoming constantly more aware, nearly all human acts carry with them some degree of risk. When that risk is slight enough that it is commonly disregarded, however, the standard of ordinary care is not violated. Such is the case here with the taking of birth control pills."
 
 
 22
 667 P.2d at 300. Similarly, Mrs. O'Gilvie continued her use of tampons after being reassured by her doctor that she did not have toxic shock. The rationale of Allman clearly precludes a finding that Mrs. O'Gilvie's disregard of the package warning under these circumstances was unreasonable.
 
 
 23
 Even Playtex does not argue that Mrs. O'Gilvie was at fault merely in using tampons. Rather, Playtex contends that her conduct was unreasonable because she failed to discontinue their use after she developed the symptoms of toxic shock syndrome, which she recognized, and because she did not seek a second medical opinion despite skepticism about Dr. Hays' diagnosis. This is so, it says, because its warning told her to discontinue use and see a doctor if she got the described symptoms.
 
 
 24
 Mrs. O'Gilvie's conduct in continuing to use tampons could be unreasonable only if the Playtex warning adequately advised her of the danger. See, e.g., Billiar v. Minnesota Mining & Mfg. Co., 623 F.2d 240, 245 (2d Cir.1980). Indeed, in its proposed jury instruction on Mrs. O'Gilvie's comparative fault, Playtex stated:
 
 
 25
 "In regard to Betty O'Gilvie's negligence, the defendants allege that if Betty O'Gilvie had toxic shock syndrome, she had knowledge of the risk of TSS with tampon use and chose to accept that risk, and that she continued to use tampons with knowledge of the warning contained in the package, and that such conduct contributed to cause any injury or damage she may have suffered. If you find that Mrs. O'Gilvie acted in such manner, you must find that she was negligent and at fault."
 
 
 26
 Rec., vol. 1, at 52 (emphasis added). A defendant may not limit its liability by relying on a plaintiff's failure to heed an insufficient warning. See, e.g., Ferebee v. Chevron Chem. Co., 736 F.2d 1529, 1538-39 (D.C.Cir.), cert. denied, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); Billiar, 623 F.2d at 245. In essence, the issue of the adequacy of the warning, which went to the jury, resolves any issue of Mrs. O'Gilvie's fault as well. See Billiar, 623 F.2d at 245-46. If the jury had decided that the warning was adequate, Playtex would not have been liable and Mrs. O'Gilvie's fault in not following the warning would have been irrelevant. Instead, the jury decided the warning was inadequate, and this finding is dispositive of the comparative fault issue because failure to heed an inadequate warning is not unreasonable. Playtex' argument on appeal that Mrs. O'Gilvie was at fault in disregarding a warning that did not properly apprise her of the very hazard to which she fell victim is simply without legal or logical support. See Ferebee, 736 F.2d at 1538-39; Billiar, 623 F.2d at 245; see generally 4 F. Harper, F. James, Jr. & O. Gray, The Law of Torts Sec. 20.5, at 147-61, Sec. 22.15, at 393-94 (1986).
 
 B.
 
 27
 Nor do we agree with Playtex' assertion that the trial court erred in failing to allow the jury to assess the comparative fault of the manufacturers of Kotex and Tampax products. Comparison of the fault of these other manufacturers is precluded because it was not timely raised by Playtex as required by Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449 (10th Cir.1982).[4] In Hardin, as here, we were concerned with the propriety of allowing the jury to assess comparative fault when the issue had not been properly raised in the pleadings or the pretrial order. We pointed out that "[this] circuit permits a post-judgment amendment of a pretrial order to conform to the evidence if an issue has been tried with the express or implied consent of the parties and not over objection." Id. at 456. "Implied consent is found where the parties recognized that the issue entered the case at trial and acquiesced in the introduction of evidence on that issue without objection." Id. at 457. The defense that a phantom party contributed to a plaintiff's injury is in the nature of an avoidance, and normally would be required under Fed.R.Civ.P. 8(c) to be pleaded affirmatively in the answer. Id. at 458. "[B]ecause the major purpose of Rule 8(c) is to provide particularized notice of certain matters, courts must be particularly careful to scrutinize the record to ensure that plaintiff had adequate notice and opportunity to rebut the tardily-raised Rule 8(c) defense before finding that it was tried by consent." Id.
 
 
 28
 Scrutiny of the record in this case reveals circumstances far more egregious than those the court held in Hardin to have denied the plaintiff a fair opportunity to respond. See id. at 459. Playtex did not raise this comparative fault issue in its pleadings, the pretrial order, or the pretrial hearing. Playtex filed its first set of requested jury instructions on January 18, 1985, four days before the trial started. These instructions contained references to the comparative fault of Mrs. O'Gilvie and Dr. Hays, but did not mention the fault of other manufacturers. On February 4, 1985, over a week into the trial, Playtex filed a supplement to its requested instructions that likewise did not propose an instruction on other manufacturers' fault. On February 14, after plaintiff had rested, Playtex presented as its first witness Mrs. O'Gilvie's sister, Cheryl Ballway, whom it had not specifically listed as a witness. Ms. Ballway testified that she had purchased all of Mrs. O'Gilvie's sanitary products and that she always purchased Kotex tampons for Mrs. O'Gilvie. She also testified that she gave her sister a Kotex tampon on the way home from the doctor's office.[5] As the judge recognized, this evidence caught plaintiff and the court by surprise. See, rec., vol. 25, at 2590-92.
 
 
 29
 Also on February 14, Playtex filed a motion for reconsideration of the denial of its request for a directed verdict. In this motion, Playtex argued that the sister's testimony barred plaintiff's claim because this evidence established that Mrs. O'Gilvie had not used Playtex tampons at all, and that they were therefore not the cause in fact of her death. Rec., vol. 1, at 58-59. This argument, which framed the use question as an either/or issue, is logically at odds with the concept of comparative negligence. It therefore could not provide notice that Playtex was asserting this defense. The court denied the motion, ruling that Mrs. O'Gilvie's use of Playtex tampons was a fact issue for the jury to resolve. The jury returned a special verdict finding that Mrs. O'Gilvie had used the Playtex product.
 
 
 30
 Not until February 22, the day the case was sent to the jury, did Playtex raise the issue of other manufacturers' comparative fault by filing a proposed jury instruction and a verdict form that would have allowed the jury to assess the fault of other manufacturers. Thus, Playtex did not inject this issue into the case even indirectly until after all the evidence had been presented and the parties had rested. It would be a miscarriage of justice to require a new trial on an issue that Playtex did not raise until it was too late for plaintiff to rebut. Such a result would be directly contrary to our holding in Hardin.
 
 IV.
 
 31
 We turn to the issues involving the punitive damages awarded in this case. Playtex contends that the district court erred in submitting the issue of punitive damages to the jury, and that the size of the award is excessive. O'Gilvie argues that the court erred in reducing the amount assessed by the jury solely as a result of events occurring after the verdict had been returned.
 
 A.
 
 32
 Punitive damages are imposed under Kansas law for "a willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs." Wooderson, 681 P.2d at 1061 (quoting Cantrell v. Amarillo Hardware Co., 226 Kan. 681, 686, 602 P.2d 1326, 1331 (1979)).
 
 
 33
 "In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages."
 
 
 34
 Id. (quoting Henderson v. Hassur, 225 Kan. 678, 594 P.2d 650, 663 (1979)).
 
 
 35
 Our review of the record reveals abundant evidence that Playtex deliberately disregarded studies and medical reports linking high-absorbency tampon fibers with increased risk of toxic shock at a time when other tampon manufacturers were responding to this information by modifying or withdrawing their high-absorbency products. Moreover, there is evidence that Playtex deliberately sought to profit from this situation by advertising the effectiveness of its high-absorbency tampons when it knew other manufacturers were reducing the absorbency of their products due to the evidence of a causal connection between high absorbency and toxic shock. This occurred in the face of Playtex' awareness that its product was far more absorbent than necessary for its intended effectiveness.[6] In our view, this evidence is sufficient to create a jury issue on whether Playtex was "grossly negligent or recklessly indifferent to the rights of others." Wooderson, 681 P.2d at 1062.
 
 
 36
 Playtex argues that the presence of a warning that complied with FDA requirements precludes, as a matter of law, any finding that Playtex exhibited the reckless indifference necessary to support an award of punitive damages. We disagree. As we noted above, compliance with FDA standards is not dispositive under Kansas law if a reasonable manufacturer would have done more. Under these circumstances, compliance with the FDA regulations does not preclude punitive damages when there is evidence sufficient to support a finding of reckless indifference to consumer safety.
 
 
 37
 Playtex also asserts that the punitive damages awarded in this case are excessive. The trial court disagreed. See infra at 1448. In Binyon v. Nesseth, 231 Kan. 381, 646 P.2d 1043 (1982), the Kansas Supreme Court set out the following factors relevant to an award of such damages:
 
 
 38
 "The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. In assessing punitive damages the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction involved should be considered. Any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. Will v. Hughes, 172 Kan. 45, 55, 238 P.2d 478 (1951). In fixing an award of punitive damages a jury may consider the amount of actual damages recovered, defendant's financial condition and the probable litigation expenses."
 
 
 39
 Id., 646 P.2d at 1047 (quoting Henderson, 225 Kan. at 694, 594 P.2d at 663 (1979)). "Any jury award of punitive damages involves a 'discretionary moral judgment.' " Silkwood v. Kerr-McGee Corp., 769 F.2d 1451, 1461 (10th Cir.1985) (quoting Smith v. Wade, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983)), cert. denied, --- U.S. ----, 106 S.Ct. 1947, 90 L.Ed.2d 356 (1986). We have reviewed the record in light of these factors. Given the financial worth of Playtex and the number of consumers whose safety was potentially impacted by Playtex' conduct with respect to this product, we agree with the trial court that the amount of punitive damages is not excessive.
 
 B.
 
 40
 Finally, we reach O'Gilvie's argument that the trial court exceeded its authority when it reduced the amount of the punitive damage award. As an initial matter, we address Playtex' contention that we are without jurisdiction to reach this issue.
 
 
 41
 Playtex argues that O'Gilvie accepted the remittitur, and therefore waived the right to appeal. "[A] plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted." Donovan v. Penn Shipping Co., 429 U.S. 648, 650, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977) (per curiam).
 
 
 42
 We have reviewed the record on this matter, and find no evidence that O'Gilvie consented to the remittitur or was given an opportunity to do so. On March 21, 1985, the trial court held a hearing on Playtex' post-trial motions, including a motion to remit both the compensatory and punitive damages. After hearing arguments on the issue, the court stated, "this jury's verdict as to punitive damages will presently stand." Rec., vol. 30, at 3525. The court then stated that it wanted to extend another option to Playtex and suggested that it would reconsider remittitur if Playtex would agree to take its high-absorbency product off the market. Although the court stated its belief that plaintiff's counsel would accept such a trade-off, there is no such statement on the record by plaintiff's counsel. The court ordered a hearing on Playtex' response to his suggestion, eventually set for May 24. The record does not contain a transcript of such a hearing, and the docket sheet does not indicate that a hearing was held on that date. Instead, on May 24 the district court filed a document styled Remittitur of Punitive Damages, ordering the reduction. The order does not offer O'Gilvie the option of accepting the remittitur in lieu of a new trial, and the record contains no indication that O'Gilvie was ever given any choice in the matter. Under these circumstances, we hold that O'Gilvie is not precluded from challenging the propriety of the remittitur on appeal.[7]
 
 
 43
 Alternatively, Playtex argues that a remittitur is an interlocutory order because the plaintiff must be given the option of accepting a new trial as an alternative to accepting the remittitur, and the grant of a new trial is not appealable until after the second trial has been held.
 
 
 44
 Playtex is correct that in an ordinary remittitur case, the plaintiff must be offered a choice between a new trial and accepting a remittitur to avoid a serious problem under the Seventh Amendment, which reserves to the jury the determination of damages. See Kennon v. Gilmer, 131 U.S. 22, 28-30, 9 S.Ct. 696, 698-99, 33 L.Ed. 110 (1889); McKinnon v. City of Berwyn, 750 F.2d 1383 (7th Cir.1984); see also 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2815, at 99 (1973); Note, Civil Procedure--Remittitur of Punitive Damages in Exchange for Product Recall--O'Gilvie v. International Playtex, 34 Kan.L.Rev. 823, 833-34 (1986). In the usual remittitur situation, a trial judge reviews the jury's verdict in order to determine if substantial evidence at trial supported the amount awarded. If the court finds that insufficient evidence exists, or finds the amount of the verdict a product of jury passion or prejudice, the court then may determine a reasonable amount as plaintiff's damages and allow plaintiff to remit the excess over such amount. See Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1168 (10th Cir.1981) (en banc) (plurality opinion), cert. denied, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983); J.T. Majors & Son, Inc. v. Lippert Bros., Inc., 263 F.2d 650, 655-56 (10th Cir.1958). In the event plaintiff refuses to remit the excess, the court must then order a new trial on the damages issue. Playtex is also correct that ordinarily a plaintiff cannot immediately appeal the grant of a new trial when he has rejected the remittitur. See Kanatser v. Chrysler Corp., 195 F.2d 104, 105 (10th Cir.1952); see also Higgins v. Smith Int'l, Inc., 716 F.2d 278, 281 (5th Cir.1983); Eaton v. Nat'l Steel Prods. Co., 624 F.2d 863, 864 (9th Cir.1980); Evans v. Calmar S.S. Co., 534 F.2d 519, 522 (2d Cir.1976). Given our conclusion below that this is not an ordinary remittitur case because the trial court lacked the power to order a remittitur based on post-trial occurrences, we hold that the cited cases are not applicable and that we have jurisdiction over the appeal.
 
 
 45
 Under both federal and Kansas law, remittitur is not proper unless the amount of damages awarded is so excessive that it shocks the judicial conscience. See, e.g., Malandris, 703 F.2d at 1168; Henderson v. Hassur, 225 Kan. 678, 594 P.2d 650, 665 (1979). To the extent this determination involves procedural issues or requires an examination of the sufficiency of the evidence to support the verdict, the inquiry is governed by federal law. See Donovan, 429 U.S. at 649-50, 97 S.Ct. at 836-37; K-B Trucking Co. v. Riss Int'l Corp., 763 F.2d 1148, 1162 (10th Cir.1985); 19 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4511, at 179 (1982). However, the circumstances under which punitive damages are available in a diversity case are governed by state law, see Spaeth v. Union Oil Co., 710 F.2d 1455, 1459-60 (10th Cir.1983); Saval v. BL Ltd., 710 F.2d 1027, 1033 (4th Cir.1983), as are the substantive elements upon which an award of punitive damages may be based, see Spaeth, 710 F.2d at 1460; Malandris, 703 F.2d at 1177. Thus, an assessment of the propriety of awarding punitive damages and the sufficiency of the evidence to support the award must necessarily be made by reference to the factors that the state has deemed relevant in determining whether punitive damages are appropriate.
 
 
 46
 In this case, the judge reviewed his notes on the evidence supporting the award of punitive damages at the post-trial hearing and stated that he was "satisfied there was sufficient evidence there" and "that the jury's answers were intelligently drawn, they were not drawn out of passion or prejudice, they understood this evidence." Rec., vol. 30, at 3517. The judge also stated that "the amount of the verdict does not bother me, nor shock my conscience, and in light of the findings this jury made I'm not surprised with it." Id. at 3524. He then declared that had O'Gilvie been allowed to seek punitive damages of $20,000,000, an award for that amount would not have been a surprise to him and would not have been remitted.
 
 
 47
 Notwithstanding the court's ruling that the punitive damages verdict was supported by the evidence, was not excessive, and did not shock its conscience, it assured counsel for Playtex that substantial modification or complete remittitur would be forthcoming if Playtex should decide to remove its super-absorbent tampons from the market. In so doing, the court stated its view that this verdict was only the beginning, and that other cases would follow.
 
 
 48
 We find no authority in either the relevant federal or state law that would permit a trial court to remit a punitive damage award under the circumstances of this case. This court has said that, as a matter of federal law,
 
 
 49
 "absent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate."
 
 
 50
 Malandris, 703 F.2d at 1168 (emphasis added). The trial court's action here violated this standard both because it expressly found that the award did not shock its judicial conscience and because it based its decision to remit on events occurring after trial.[8]
 
 
 51
 Nor do we find any support for the court's action in the substantive law of Kansas. The Kansas Supreme Court has clearly ruled that the only factors relevant to a punitive damage award are those involving "the quality of the character of the tortious act itself." Ettus v. Orkin Exterminating Co., 233 Kan. 555, 665 P.2d 730, 741 (1983). In Ettus, the defendant Orkin contended that the trial court erred in refusing to admit evidence of Orkin's attempts to settle the claim at issue. Orkin sought to present this evidence to show mitigating circumstances in defense of the plaintiff's claim for punitive damages. Id., 665 P.2d at 739-40. In upholding the trial court, the supreme court pointed out:
 
 
 52
 "Many elements enter into settlement negotiations and offers which have no bearing whatsoever on the culpability of the defendant for the alleged wrongful conduct. Availability of witnesses or other critical evidence, the financial condition of the parties, expense of litigation, possible adverse publicity and the possible generation of other claims are just a few things that come to mind which might encourage settlement offers but bear no relevant relationship to the awarding of punitive damages. Considering the underlying policy behind the granting of punitive damages, that is punishment and deterrence, we think the rule adopted by the Oregon court is the better approach to the issue. Absent unusual circumstances, not shown in this case, we hold settlement offers and negotiations are inadmissible in evidence even when offered for the limited purpose of defending against an award of punitive damages."
 
 
 53
 Id., 665 P.2d at 743 (emphasis added). Of particular relevance to our case is the court's quotation from the Oregon case referred to above:
 
 
 54
 "Evidence of the parties' conduct subsequent to the event, which produces plaintiff's claim for punitive damages, whether aggravating or mitigating, must be probative of the defendant's state of mind at the time of the transaction. [Citation omitted.]
 
 
 55
 ....
 
 
 56
 "In the case here at issue the evidence of contrition and a conciliatory attitude of one of defendant's agents after the complaint was filed has scant relevance respecting the state of mind of other agents of defendant at the time [of the injury-causing event]. Assuming the evidence established the good faith and good will of defendant's president toward plaintiff, such conduct came as a response to the complaint, which prayed for substantial punitive damages. The evidence shows a desire to 'buy peace' and minimize the risk of an award of punitive damages and not that defendant dealt in good faith with plaintiff [at the time of the act complained of]."Id., 665 P.2d at 741 (quoting Byers v. Santiam Ford, Inc., 281 Or. 411, 416-17, 574 P.2d 1122, 1125 (1978), and adding emphasis).
 
 
 57
 We also find instructive the case of Ford v. Guarantee Abstract & Title Co., 220 Kan. 244, 553 P.2d 254, 276-77 (1976), which is factually analogous to the instant case. In Ford, the trial court initially approved an award of punitive damages and then remitted a large portion of the award apparently upon learning after post-trial motions of an indemnification agreement affecting payment of the award. The Kansas Supreme Court held that the trial court erred in basing its remittitur on matters outside the record. "The court is not privileged to go beyond the issues in the case and make any determination whatsoever on matters outside of those issues."[9] Id., 553 P.2d at 277.
 
 
 58
 In sum, we conclude that because the post-trial conduct upon which the trial court relied in ordering remittitur in this case had no relevance to the injurious conduct underlying the claim for punitive damages, the court was without authority under either state or federal law to reduce the award on that basis. In addition, we are compelled to point out that the court's order subverts the goals of punishment and deterrence that underlie the assessment of punitive damages in Kansas. Far from punishing Playtex, the trial court here rewarded the company for continuing its tortious conduct long enough to use it as a bargaining chip in the remittitur proceedings. See Note, Civil Procedure--Remittitur of Punitive Damages in Exchange for Product Recall--O'Gilvie v. International Playtex, 34 Kan.L.Rev. 823, 836 (1986). The possibility that other potential defendants would be able to reduce their liability for punitive damages in the same way would encourage them to pursue the very behavior that the punitive award here was intended to deter, and thus would discourage voluntary cessation of injury-causing conduct. See id. at 838. Such a result is simply untenable.
 
 V.
 
 59
 We have considered Playtex' remaining arguments and to the extent they have not been addressed by our discussion we find them without merit. The judgment against Playtex is affirmed. The order reducing the punitive damage award is reversed, and the case is remanded to the trial court with instruction to reinstate the judgment in accordance with the jury verdict.
 
 SETH, Circuit Judge, dissenting:
 
 60
 I must respectfully dissent from the position taken by the majority and their characterization of the case. This case is really a medical malpractice case in strict liability clothing. The record demonstrates that the decedent had a good layperson's knowledge of toxic shock syndrome ("TSS") and its symptoms, she knew of the warnings on the Playtex box, she thought she had symptoms of TSS and went to the doctor to ask about TSS.
 
 
 61
 The experts, even the doctor she consulted, agreed that if the diagnosis had been correct and she had then received treatment she would have survived. The warnings on the box with what she knew got her to the doctor which should have been the right place. This is what the warnings were for but the failure was the diagnosis--scarlet fever. This destroyed everything. When she later became seriously ill with a very high fever the doctor over the phone prescribed aspirin and water and the delay continued until it was too late.
 
 
 62
 This case cannot serve as a precedent for a products liability action because it is not such a case and is instead, as mentioned, a medical malpractice case. I would reverse and remand for a new trial for the following reasons.
 
 
 63
 The uncontested facts are that during her menstrual period in late March 1983, Mrs. O'Gilvie developed a sore throat, a red sunburn-type rash, a high fever, and diarrhea. These ailments are symptomatic of TSS, as well as various other diseases.
 
 
 64
 Decedent's husband testified that his wife first told him that she wasn't feeling well on the morning of Wednesday, March 30, 1983. Decedent's friend and classmate at a local school testified that on the way to class on Tuesday, March 29, Mrs. O'Gilvie complained that she had had a sore throat "all weekend" and a vaginal yeast infection.
 
 
 65
 On the morning of March 30, decedent made an appointment with her physician, Dr. Hays, a family practitioner in Wichita. Before the appointment Mrs. O'Gilvie read a TSS warning brochure from a package of Playtex tampons. Mrs. O'Gilvie's sister, who drove her to the doctor's office, also read the warning insert. The sister testified:
 
 
 66
 "[Betty] had a flyer that has the warnings on it and that's why she was going to ask the doctor about the toxic shock because if you read the flyer, it shows that vomiting, diarrhea, rash, temperature, is all what could be classified as toxic shock and I read that."
 
 
 67
 During the drive to the doctor's office decedent discussed her concern about TSS with her sister. On a prior occasion, Mrs. O'Gilvie's mother-in-law, Mrs. Hunt, had talked with Mrs. O'Gilvie about TSS and had given her an article on the subject.
 
 
 68
 During the doctor's appointment, Mrs. O'Gilvie specifically asked about the possibility of TSS. Dr. Hays advised her that, "I did not think that was a thing to be concerned about," and diagnosed her condition as scarlet fever and a vaginal yeast infection. He prescribed a penicillin-based antibiotic that was appropriate for scarlet fever but not effective against TSS.
 
 
 69
 On her way home from Dr. Hays' office, Mrs. O'Gilvie asked her sister for a tampon, and her sister supplied a Kotex product. That afternoon, Mrs. O'Gilvie's symptoms continued and by 10:00 p.m. on March 30 her temperature had climbed to 105?. Alarmed, her husband called Dr. Hays at home and was advised by the doctor to administer aspirin and water and continue the antibiotics. Mr. O'Gilvie also called his mother, Mrs. Hunt, who came to the O'Gilvie home to attend her daughter-in-law during the night of March 30 and the morning and afternoon of March 31.
 
 
 70
 At around 9:00 a.m. on the morning of March 31, Mrs. Hunt telephoned Dr. Hays' office to report that Mrs. O'Gilvie's symptoms were not relieved. She spoke with a nurse, who advised continuing the prescribed treatment. At around 11:00 a.m. Mrs. Hunt supplied a Tampax tampon to Mrs. O'Gilvie. Early that afternoon, Mrs. Hunt noticed that Mrs. O'Gilvie's condition was deteriorating: her fingers appeared bluish and she was having difficulty speaking. Mrs. Hunt telephoned the doctor's office at around 2:00 p.m. and rushed Mrs. O'Gilvie there, where the nursing staff began emergency treatment and telephoned Dr. Hays at his home. Mrs. O'Gilvie was then transported to a Wichita hospital where Dr. Hays met her and diagnosed her condition as either TSS or a massive infection. He called for consultations by infectious disease, cardiac, and renal specialists, but treatment was not successful. On April 2, 1983, Mrs. O'Gilvie died. The cause of death listed on the hospital records was TSS.
 
 
 71
 On the day after Mrs. O'Gilvie's funeral, her friend and school classmate went to the O'Gilvie home to assist with some housekeeping chores. The friend testified that in the course of housecleaning, she found a box of Playtex tampons under the bathroom sink. The classmate also testified that during February 1983, she had seen the decedent purchase a box of Playtex tampons at a local supermarket. Mr. O'Gilvie testified that his wife customarily used Playtex sanitary products. Decedent's sister, however, testified that she routinely shopped for the O'Gilvie family at a nearby military base using her PX privileges and that during these shopping trips she purchased Kotex products exclusively for Mrs. O'Gilvie. Shortly after Mrs. O'Gilvie died, a Playtex tampon was found in her purse. Playtex International was the only named defendant and the only tampon manufacturer mentioned in the special interrogatories to the jury.
 
 
 72
 Although the etiology and kinetics of TSS are subjects of scientific debate and disagreement, there is a recognized association between the use of tampons and the onset of toxic shock syndrome. TSS-producing toxins are emitted by staphylococcus-aureus bacteria that have been found to multiply in numerous brands of catamenial products, including those manufactured by Playtex, Kotex and Tampax. The toxins elaborated in the bacterial colonies have the capability of entering, infecting and ultimately poisoning the patient's system within the span of a few days.
 
 
 73
 The case was submitted to the jury on theories of strict tort liability for manufacturing a defective product; strict liability for inadequate warnings; negligent failure to warn; negligent failure to test the product; and negligent design.
 
 
 74
 Playtex tendered instructions on comparative fault and assumption of risk and contributory negligence. The proposed instructions included a directive to the jury that "[t]he parties to whom you have the discretion to assign fault are: Betty O'Gilvie, Dr. Hays (or his agents or employees), International Playtex, Inc., [o]ther tampon manufacturers."
 
 
 75
 The court denied Playtex's requested instructions on decedent's comparative fault and also rejected the defenses of comparative negligence and assumption of risk. Instead, the court gave Instruction 23 concerning the decedent's conduct:
 
 
 76
 "As indicated, the defendant has denied each of the plaintiffs' contentions and further contends that Betty O'Gilvie was, in whole, or in part, causally responsible for the injuries and damages to herself and her family.
 
 
 77
 "While a consumer has a duty to use ordinary care for her own safety and protection, because of the instincts of self-preservation and love of life, it is presumed here that the deceased, Betty O'Gilvie, at the time of the alleged use of defendant's product, was exercising requisite care to avoid any injury. In the Court's view, no evidence has been offered to overcome this presumption, and the issue of the decedent's negligent conduct, if any, is not before you. Additionally, it is the Court's finding that the doctrine of assumption of risk is not applicable in this case. Accordingly, the conduct of Betty O'Gilvie is not before you."
 
 
 78
 (R.1:137.)
 
 
 79
 The court also refused to instruct the jury on the comparative fault or causation of other tampon manufacturers, specifically Kotex and Tampax. As for the Tampax product, the court reviewed the medical testimony and concluded that by the time decedent used it on the morning of March 31, her condition was probably irreversible. Regarding Kotex, the court observed that no evidence connected that product with Mrs. O'Gilvie's TSS.
 
 
 80
 Defendant objected to the omission of comparative causation and assumption of risk instructions and to the court's Instruction 23. Playtex also objected to the omission of other tampon manufacturers on the verdict form. At the close of plaintiffs' evidence Playtex had moved for a directed verdict on grounds, inter alia, that "there [was] no proof that Betty O'Gilvie used defendant's product in March, 1983."
 
 
 81
 The jury awarded a total of $250,000 to Mrs. O'Gilvie's estate for the decedent's pain and suffering; $1.25 million to Mrs. O'Gilvie's survivors as compensatory damages; and $10 million in punitive damages. The percentage of causation was allocated 20% to Dr. Hays and 80% to Playtex. Judgment was entered on these amounts, but the district court subsequently granted a partial remittitur of the punitive damages, based on the defendant's posttrial remedial conduct. 609 F.Supp. 817 (D.Kan.). Plaintiff appeals from the remittitur of punitive damages.
 
 
 82
 Playtex filed a motion for new trial or judgment notwithstanding the verdict, based on the court's exclusion of comparative fault instructions concerning Mrs. O'Gilvie's conduct and other tampon manufacturers. These contentions are central to defendant's cross-appeal. Playtex also maintains that the court's instructions and comments about Playtex's toxic shock warnings misled the jury and that the evidence was insufficient to support punitive damages.
 
 
 83
 The Kansas legislature abolished contributory negligence as a bar to recovery in civil actions and adopted a modified form of comparative causation, sometimes called comparative fault, under which liability is allocated "in the proportion that the amount of his or her causal negligence bears to the amount of the causal negligence attributed to all parties against whom such recovery is allowed." Kan.Stat.Ann. Sec. 60-258a(d). See also Kennedy v. City of Sawyer, 228 Kan. 439, 618 P.2d 788 (1980).
 
 
 84
 The doctrine of comparative causation or comparative fault applies under Kansas products liability law to both strict liability and implied warranty claims. Kennedy v. City of Sawyer, 228 Kan. 439, 618 P.2d 788 (1980). It also applies to all degrees and types of fault. Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449 (10th Cir.1982).
 
 
 85
 A touchstone of comparative causation is that "all parties to an occurrence must have their fault determined in one action, even though some parties cannot be formally joined or held legally responsible." Albertson v. Volkswagenwerk Aktiengesellschaft, 230 Kan. 368, 634 P.2d 1127, 1132 (1981). Even if a plaintiff has not formally joined a person or entity whose causal conduct may have contributed to the damages, the district court, in Travelers Insurance Companies v. Jackson Communications Corp., 573 F.Supp. 1139, 1141 (D.Kan.1983), said: "[T]he absent tortfeasor's negligence may nevertheless be compared. Those who are not defendants but whose liability is compared are called 'phantom' parties. Baird v. Phillips Petroleum Co., 535 F.Supp. 1371, 1378 (D.Kan.1982)."
 
 
 86
 During the trial, the parties and the district court referred to comparative causation and assumption of risk interchangeably. In Hardin v. Manitowoc-Forsythe Corp., 691 F.2d 449, 454 n. 4 (10th Cir.1982), we observed that under Kansas' comparative causation doctrine:
 
 
 87
 "[P]laintiff's fault must be compared with that of defendant whether it be characterized as contributory negligence, assumption of risk, product misuse, or unreasonable use. These defenses all depend on the reasonableness of plaintiff's conduct, a negligence concept."
 
 
 88
 Our decision in Prince v. Leesona Corp., 720 F.2d 1166 (10th Cir.1983), a Kansas strict products liability case, referred to the assumption of risk defense under Kansas law. Prince and Hardin v. Manitowoc-Forsythe both explain that the assumed risk doctrine was merely a means of permitting a jury to do what now it is required to do under comparative causation, thus to determine whether a consumer's conduct departed from the appropriate standard of care. The purpose of the comparative causation statute is to allow the jury to assess the reasonableness of the causal conduct and apportion liability accordingly. As we stated in Palmer v. Ford Motor Co., 498 F.2d 952, 953 (10th Cir.1974), a products liability case under Kansas law: "The controlling factor is causation.... The labelling of the defense as contributory negligence or as assumption of risk is not determinative."
 
 
 89
 The primary focus of comparative causation analysis under Kansas law is thus on the duties which each party bears to the other. Hardin v. Manitowoc-Forsythe, 691 F.2d at 455 n. 5. In Prince v. Leesona Corp., 720 F.2d 1166, at 1171, we said:
 
 
 90
 "In essence, what Kansas has done is to let the jury determine the degree to which each actor has departed from his or her respective duty and apportion fault accordingly. As explained in Kennedy, all types of fault, regardless of degree, are to be compared with that of defendant whether the fault is characterized as contributory negligence, assumption of risk, product misuse, or unreasonable use. All of these defenses depend on the reasonableness of plaintiff's conduct, a negligence concept." (Footnote omitted.)
 
 
 91
 In order to compare causation under Kansas law the jury must be allowed to consider the doctrine as to all participants in the related series of events all within the sufficiency of the evidence strictures.
 
 
 92
 The possibility that the user would be mis-diagnosed does not negate the possibility that the jury could have found plaintiff's own conduct unreasonable, either in continuing to use the tampons or in delaying her visit to the doctor.
 
 
 93
 The facts surrounding the O'Gilvie claims are markedly different from the situation presented in Wooderson v. Ortho Pharmaceutical Corp., 235 Kan. 387, 681 P.2d 1038 (1984). Wooderson was a failure-to-warn case where the defendant pharmaceutical manufacturer asserted that the plaintiff's negligent use of the product and her three-day delay in the course of medical treatment were contributing causes of her injury. The expert testimony in Wooderson indicated that plaintiff, who had been ingesting defendant's product for several years, had suffered cumulative long-term blood vessel deterioration. The trial court refused to give a comparative causation instruction regarding the plaintiff's conduct and the Kansas Supreme Court affirmed because there was no evidence that plaintiff's three-day delay could have caused the disaster. Here, on the other hand, a three-day difference apparently was crucial, given the short-term cycle of TSS. Thus "[t]he question of causation ... is one for resolution by the jury in the absence of conclusive proof that makes only one result possible." Palmer, 498 F.2d at 953. Where the plaintiff's own conduct caused or partially caused his or her injury plaintiff's responsibility and reasonableness must be compared with the conduct of other participants. Lenherr v. NRM Corp., 504 F.Supp. 165, 175 (D.Kan.1980); Brown v. Keill, 224 Kan. 195, 580 P.2d 867, 875-76 (1978). Kansas courts have found error in the refusal of a comparative fault instruction which did not include the consideration of all potentially culpable participants. McCart v. Muir, 230 Kan. 618, 641 P.2d 384, 388-89 (1982).
 
 
 94
 The instructions in the case before us specifically excluded consideration of questions of causation posed by plaintiff's own conduct. Those questions properly lay within the province of the jury as did the questions as to causation arising from decedent's use of other products. Pape v. Kansas Power and Light Co., 231 Kan. 441, 647 P.2d 320 (1982); McCart v. Muir, 230 Kan. 618, 641 P.2d 384 (1982).
 
 
 95
 Regarding the "phantom defendants," Kotex and Tampax, expert testimony varied as to when Mrs. O'Gilvie's condition became irreversible, and a jury question arose. The evidence did not conclusively establish whether Mrs. O'Gilvie's condition was affected by the Kotex or Tampax products that were supplied to her on March 30 and 31 and before. Nevertheless, the evidence that those products were used by the decedent during a critical time and the possibility that they could have been associated with her TSS necessitated the submission of the issue of comparative causation of the phantom defendants to the jury. This was not done as the special interrogatories only asked whether Mrs. O'Gilvie used Playtex tampons, without mentioning any other brands, and whether the Playtex product caused or contributed to her development of TSS. Although TSS toxins may remain in the bloodstream or organs, Dr. Hays testified that once a tampon is removed the site of toxin-producing bacteria is also removed. When a new tampon is inserted it presents a new possibility for staphylococcus bacteria to colonize. Some of the expert testimony supported this theory, although other testimony indicated that progressive, cumulative toxemia may have been completed in Mrs. O'Gilvie's case by the time on March 31 that the Tampax product was used. Yet another expert witness, a research microbiologist, recounted an experiment performed in August 1983, indicating that Playtex tampons appeared to contain a substance inhibiting the growth of staphylococcus-aureus bacteria. The jury should have been allowed to weigh the testimony and consider whether the Kotex or Tampax products contributed to the decedent's condition. The district court acknowledged that the onset of TSS--before or after use of the Kotex or Tampax tampons--was a complicated question.
 
 
 96
 Pursuant to FDA regulations that became effective in 1982, Playtex tampon packages bore the notice: "Attention: Tampons are associated with Toxic Shock Syndrome (TSS). TSS is a rare but serious disease that may cause death. Read and save the enclosed information." (R.10:145.) The warning brochure included with the Playtex product in part stated in very large type:
 
 
 97
 "IMPORTANT INFORMATION ABOUT TOXIC SHOCK SYNDROME (TSS)"
 
 And stated in smaller block type:
 
 98
 "READ AND SAVE THIS INFORMATION ABOUT THESE TAMPONS:
 
 
 99
 "WARNING SIGNS
 
 
 100
 "WARNING SIGNS OF TSS FOR EXAMPLE ARE: SUDDEN FEVER (USUALLY 102? OR MORE) AND VOMITING, DIARRHEA, FAINTING OR NEAR FAINTING WHEN STANDING UP, DIZZINESS, OR A RASH THAT LOOKS LIKE A SUNBURN.
 
 
 101
 "IF THESE OR OTHER SIGNS OF TSS APPEAR, YOU SHOULD REMOVE THE TAMPON AT ONCE, DISCONTINUE USE, AND SEE YOUR DOCTOR IMMEDIATELY."
 
 Further in smaller type:
 
 102
 "There is a risk of TSS to all women using tampons during their menstrual period. TSS is a rare but serious disease that may cause death. The reported risks are higher to women under 30....
 
 
 103
 "You can avoid any possible risk of getting tampon-associated TSS by not using tampons...."
 
 
 104
 One of the most significant aspects of this case is what prompted the decedent to visit her doctor when she became ill on March 29 or 30, and her awareness at that time of the risk of TSS to the users of tampons. The record shows that she had some prior knowledge of the relationship of the use of tampons with TSS and the risk involved. She had also read the warning on the Playtex enclosure and box and was concerned that she might have TSS. Her concern moved her to see her doctor. She thus asked her sister to drive her to Dr. Hays' office. She told her sister, as mentioned, that she was going to ask the doctor if she had TSS. She said that she had read a pamphlet which indicated her symptoms were like those of TSS. The decedent did see her doctor on that day. She asked him whether she had TSS and about tampon use and TSS.
 
 
 105
 Thus the record demonstrates that the decedent was aware of the risks associated with the use of tampons; that she knew what the symptoms of TSS were; that the symptoms she had on March 30 were similar to those of TSS; that this similarity was such that she wanted to see the doctor and ask whether she had TSS. This she did. Thus her visit to the doctor must be taken as decedent's response to her symptoms in the context of what she knew about tampons and TSS. This knowledge included what her mother-in-law provided and the warnings on the Playtex box. Her reaction was right. Her suspicions as to her symptoms were correct and her actions should have been effective. The information she had and the warnings had served a purpose. However, she continued to use tampons during this short but critical period before she saw the doctor despite her concern that she might have TSS and the warning on the box or pamphlet to stop using tampons under such circumstances. With decedent's visit to Dr. Hays' office the proof moved from one significant segment of the case to another. Her responses to her symptoms and knowledge had gotten her there. The doctor was then to provide an answer to her worries. In response to her concern, her questions about TSS, and her symptoms, Dr. Hays told her she had scarlet fever. The decedent continued thereafter to use tampons but apparently not those of defendant.
 
 
 106
 The doctors who testified were all of the opinion that had the decedent been treated for TSS when she first saw Dr. Hays, or at least had then been hospitalized, she probably would have survived. This was also the opinion of Dr. Hays. Dr. Hays maintained throughout his testimony that Mrs. O'Gilvie had scarlet fever at the time of her appointment on March 30 and developed TSS on the afternoon of March 31 when her fingers turned blue.
 
 
 107
 The record is not altogether clear as to when the decedent read the warning on the Playtex package and folder in the package. However, as mentioned, it was shortly before she went to see the doctor and probably on the second day that she felt ill--the 30th. It was at a time, according to the doctors who testified, when she probably would have survived had she received a correct diagnosis and treatment. The mis-diagnosis destroyed the effectiveness of the warnings here in evidence.
 
 
 108
 The use of tampons by the decedent after her concern that she had TSS introduced an element and degree of causation by the decedent which, under Kansas law, must be evaluated by the jury as herein described. This was not done at trial as the trial judge instructed the jury that causation by the decedent was not its concern. Thus the trial court observed, and included in Instruction No. 23, a statement that Mrs. O'Gilvie's "fault" should not be considered by the jury as the defendant had failed to rebut the presumption of due care attributed to a decedent under these circumstances. This was in substance a directed verdict for the plaintiff as to her comparative fault under the statute. As to the presumption of care attributed to the decedent, the Kansas court in Akin v. Estate of Hill, 201 Kan. 306, 440 P.2d 585, 588, observed that "[t]his presumption yields ... to direct controverting evidence." The record before us contains such evidence as herein described.
 
 
 109
 The measure for comparative causation under Kansas products liability law is the degree to which an injured consumer departed from his or her duty of ordinary care. Accordingly, the jury should be given the opportunity to assess decedent's conduct as to causation and reasonableness. The jury should be allowed to examine the causation, if any, by the "phantom defendants" Kotex and Tampax as well.
 
 
 110
 I would reverse the judgment of the district court and remand for a new trial.
 
 
 
 [1]
 The jury attributed 80% of the total fault to Playtex and 20% to Dr. Hays, Betty's physician, who was not a party to the lawsuit. Accordingly, the court entered judgment against Playtex for 80% of the total amount of actual damages
 
 
 [2]
 The warning on the outside of the Playtex package stated:
 "Attention: Tampons are associated with Toxic Shock Syndrome (TSS). TSS is a rare but serious disease that may cause death. Read and save the enclosed information."
 Brief of Defendant-Appellee, Cross-Appellant at 7. The package insert stated:
 "WARNING SIGNS
 WARNING SIGNS OF TSS FOR EXAMPLE ARE: SUDDEN FEVER (USUALLY 102? OR MORE) AND VOMITING, DIARRHEA, FAINTING OR NEAR FAINTING WHEN STANDING UP, DIZZINESS, OR A RASH THAT LOOKS LIKE A SUNBURN.
 "IF THESE OR OTHER SIGNS OF TSS APPEAR, YOU SHOULD REMOVE THE TAMPON AT ONCE, DISCONTINUE USE, AND SEE YOUR DOCTOR IMMEDIATELY.
 "There is a risk of TSS to all women using tampons during their menstrual period. TSS is a rare but serious disease that may cause death. The reported risks are higher to women under 30 years of age and teenage girls. The incidence of TSS is estimated to be between 6 and 17 cases of TSS per 100,000 menstruating women and girls per year.
 "You can avoid any possible risk of getting tampon-associated TSS by not using tampons. You can possibly reduce the risk of getting TSS during your menstrual period by alternating tampon use with sanitary napkin use and by using tampons with the minimum absorbency. Playtex makes Regular absorbency tampons for lighter flows and Super and Super Plus absorbencies for heavier flows.
 "If you have had warning signs of TSS in the past, you should check with your doctor before using tampons again.
 "Information about TSS on the package and in this insert are provided by Playtex in the public interest and in accordance with the Food and Drug Administration (FDA) tampon labeling requirements. TSS is believed to be a recently identified condition caused by a bacteria called staphylococcus aureus. The FDA does not maintain that tampons are the cause of TSS. The FDA recognizes that TSS also occurs among nonusers of tampons.
 "If you have any questions about TSS or tampon use, you should check with your doctor."
 Id. at Addendum A.
 
 
 [3]
 Playtex also complains on appeal that the trial judge improperly remarked to the jurors that after hearing the evidence in this case, they knew more about toxic shock syndrome than the FDA. Playtex did not assert this as error below, and we will therefore not consider it here
 
 
 [4]
 Moreover, the evidence discloses that the only time Mrs. O'Gilvie used a Tampax product was at 11 a.m. on Thursday, March 31, when one was inserted by her mother-in-law. The evidence is undisputed that by that time Mrs. O'Gilvie was already so ill that she had virtually no chance of survival
 
 
 [5]
 We note that Ms. Ballway's testimony was substantially impeached by rebuttal evidence that, the day after Mrs. O'Gilvie died, a Playtex tampon was found in the purse she had taken to Dr. Hays' office and a box of Playtex tampons was found in her bathroom. There was also rebuttal evidence that Ms. Ballway blamed her sister's husband and his mother for the death. Finally, the record discloses that Ms. Ballway was the one who originally contacted plaintiff's lawyer and gave him the name of Playtex to sue, and that she believed she should have been able to bring the action rather than Mr. O'Gilvie
 
 
 [6]
 Plaintiff's exhibit 6 is an internal Playtex memorandum establishing the belief by certain Playtex employees that the Playtex super deodorant tampon was exceptionally over-absorbent. After comparing the tampon's absorbency with the average menstrual flow, the writer stated, "[c]onsidering the foregoing, our tampons are similar to automobiles which can achieve a speed of 300 miles an hour, but with which 90% of the drivers will never exceed 55 miles per hour and the remainder will occasionally drive at speeds up to 90 miles per hour." Rec., vol. 2, at 257 (emphasis in original). After noting that leakage was the original reason for increasing tampon absorbency, the writer stated:
 "In being obsessed with 'absorbency' we lost sight of the fact that 'leakage' complaints did not decrease as the tampon absorbency potentials were increased. Like the definition of a fanatic 'one who redoubles his efforts because he has lost sight of his goals', we then converted our heavier weight tampons to PA fiber, providing even more 'absorbency' and in fact threw in a 3.8 g PA 'Super Plus' for good measure."
 Id.
 
 
 [7]
 Plaintiff did not argue below, as he does here, that the trial court was without authority to reduce the punitive damages because of the post-trial conduct of Playtex. Given the unusual sequence of events as described above, and the public importance of this issue, we elect to address the remittitur question in the interest of justice. See Hansen v. Heckler, 783 F.2d 170, 174 n. 4 (10th Cir.1986)
 
 
 [8]
 Playtex relies on Spaeth v. Union Oil Co., 710 F.2d 1455 (10th Cir.1983), as support under federal law for the court's remittitur here. That case is distinguishable on the very grounds set forth above. In Spaeth, a remittitur was ordered after this court had considered the events occurring prior to trial and at trial, and based on those events had concluded that the punitive damage award was excessive. The case was remanded for the district court to order an appropriate remittitur or, if unacceptable to plaintiff, a new trial
 
 
 [9]
 In Ford, the Kansas Supreme Court concluded, after reviewing the facts and circumstances presented by the record, that a remittitur was warranted on appeal